CITY PUBLIC SERVICE BOARD OF SAN ANTONIO and Houston Lighting & Power Company, Appellants,

v.

PUBLIC UTILITY COMMISSION OF TEXAS; Pat Wood, III; Robert W. Gee; Judy Walsh; South Texas Electric Cooperative, Inc.; Brazos Electric Power Cooperative, Inc.; Texas–New Mexico Power Company; Lower Colorado River Authority; et al., Appellees.

No. 03–98–00127–CV.

Court of Appeals of Texas, Austin.

Jan. 6, 2000.

---

William B. Wagner, Fulbright & Jaworski, L.L.P., Austin for appellant City Public Service Board of San Antonio.

P.M. Schenkkan, Graves, Dougherty, Hearon & Moody, Austin, for appellant Houston Lighting & Power Co.

Philip R. Segrest, Segrest & Segrest, P.C., McGregor, for appellee Brazos Electric Power Cooperative.

Fernando Rodriguez, Brickfield, Burchette & Ritts, P.C., Andrew F. Martin, City Atty., Austin, for appellees Tex-La Electric Cooperative of Tx., Inc; Deep East Electric Cooperative; East Texas Electric Cooperative; & Houston County Electric Cooperative.

Robert A. Kahn, Asst. City Atty., Austin, for appellee City of Austin.

Marianne Carroll, Akin, Gump, Strauss, Hauer & Feld, L.L.P., John Cornyn, Atty. Gen., Austin, for appellee Enron Power Marketing, Inc.

· Elizabeth R.B. Sterling, Asst. Atty. Gen., Austin, for appellees PUC; Pat Wood, III; Judy Walsh & Robert Gee.

Craig A. Morgan, Brown McCarroll & Oaks Hartline, Austin, for appellee Lower Colorado River Authority.

Suzette Ray McClellan, Asst. Public Counsel, Thomas Brocato, Asst. Public Counsel, Austin, for appellee, Office of Public Utility Counsel.

Richard L. Crozier, Davidson & Troilo, P.C., Austin, for appellee Public Utilities Bd. of City of Brownsville.

Allen H. King, Naman, Howell, Smith & Lee, P.C., Austin, for appellee Rayburn County Electric Cooperative, Inc.

Jo B. Campbell, Waco, for appellee South Texas Electric Cooperative, Inc.

Shannon K. McClendon, Austin, for appellee Texas-New Mexico Power Co.

Before Chief Justice ABOUSSIE, Justices KIDD and PATTERSON.

MACK KIDD, Justice.

We withdraw our original opinion and judgment issued August 26, 1999, and substitute this one in its place.

Appellants City Public Service Board of San Antonio ("San Antonio") and Houston Lighting & Power Company ("HL & P") (collectively "appellants") appeal from an order of the trial court granting cross-motions for summary judgment of defendant the Public Utility Commission of Texas (the "PUC")[1] declaring valid the "transmission rules," 16 Tex. Admin. Code §§ 23.67, .70 (1999), which guarantee open access and establish a rate formula to determine access charges for the transmission of wholesale electricity.[2] Appellants assign numerous points of error regarding the statutory authority under which the rules were adopted, the procedure by which the rules were adopted, and the substance of the rules themselves. We will reverse the order of the trial court and render judgment that certain parts of the transmission rules exceed the statutory authority granted to the PUC, and are thus invalid.

## BACKGROUND

Before addressing the specific factual background pertinent to this lawsuit, it is helpful to provide a context for the discussion. The electric industry in Texas has three main components: generation of power; transmission of that power on high-voltage lines over long distances; and distribution of power over shorter distances to the ultimate consumer. This lawsuit concerns the transmission segment of the electric industry, specifically the wholesale transmission of electric energy.

Generally, the incumbent natural monopoly[3] in a given region owns the transmission network used to transport power to its customers. For example, HL & P owns the transmission lines it uses to supply power to the Houston area. A voluntary association of these transmission-providing utilities has developed in Texas. Each of these individual regional networks of transmission lines are interconnected with other transmission networks across the state to form a single grid, called the Electric Reliability Council of Texas ("ERCOT").[4] The ERCOT grid allows electric

---

1. A number of parties appeared and were aligned on the side of the PUC, including Brazos Electric Power Cooperative, Inc., Cherokee County Electric Association, City of Austin, Deep East Electric Cooperative, East Texas Electric Cooperative, Enron Power Marketing, Inc., Robert W. Gee, Houston County Electric Cooperative, Lower Colorado River Authority, Office of Public Utility Counsel, Public Utilities Board of City of Brownsville, Rayburn Country Electric Cooperative, Inc., South Texas Electric Cooperative, Tex-La Electric Cooperative of Tex., Inc., Texas-New Mexico Power Company, Judy Walsh, and Pat Wood, III. We will refer to all appellees collectively as the "PUC."

2. These two rules promulgated by the PUC detail the agency's regulation of the transmission of wholesale electricity and comprise the crux of the dispute. We will refer to them collectively as the "transmission rules." *See* 16 Tex. Admin. Code §§ 23.67, .70 (1999). Rule 23.67, entitled "Open-access Compara-

ble Transmission Service," declares as its purpose "to increase competition in the sale of electric energy at wholesale within the Texas intra-state utility network, to preserve the reliability of electric service, and to enhance economic efficiency in the production and consumption of electricity." *Id.* § 23.67(a). Rule 23.70, entitled "Terms and Conditions of Open-access Comparable Transmission Service," establishes the specific terms and conditions under which transmission service is to be provided. *See id.* § 23.70.

3. The market for electric power has historically resembled a natural monopoly. A natural monopoly is a firm or industry whose cost per unit of production falls as demand rises. In other words, a single entity can supply the product more efficiently than multiple entities.

4. The ERCOT grid does not cover all of Texas. Parts of Texas are served by one of two other regional grids, the Southwest Power Pool or

power involved in a wholesale transaction to be transferred across the interconnected transmission networks from any one point on the grid to another. However, not all wholesale transactions occur between a buyer and seller whose transmission networks connect directly. Moreover, some generators of electric power own no transmission capability at all. Therefore, many wholesale transactions require the use of the transmission infrastructure of other utilities, which are not parties to the transaction, to "wheel" electric power to its ultimate destination.[5] And, because the regional units comprising ERCOT are individually owned, an entity seeking to use the transmission lines of another entity to bring its power to market must seek the transmission-provider's permission, and most likely must pay a transmission-access fee for use of the lines. Pricing in wholesale-wheeling transactions has historically been established on an ad hoc, contractual basis. This creates an opportunity for transmission-providers to influence wholesale competition through control over pricing and access to their transmission lines.

In 1995, the Texas Legislature sought to foster competition in the wholesale electricity market through its passage of the Public Utility Regulatory Act of 1995. *See* Tex. Util.Code Ann. § 31.001 (West 1998) ("PURA 95"). The legislature made specific findings that:

> The wholesale electric industry, through federal legislative, judicial, and administrative actions, is becoming a more competitive industry that does not lend itself to traditional electric utility regulatory rules, policies, and principles. As a result, *the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace. The development of a*

*competitive wholesale electric market that allows for increased participation by electric utilities and certain nonutilities is in the public interest.*

*Id.* § 31.001(c) (emphasis added). In furtherance of this goal, the legislature enacted specific legislation to ensure that the transmission segment of the industry would not hinder the development of competition in the wholesale market. In a section entitled Provision of Transmission Service, which is the focus of this appeal, the legislature provided:

> (a) An electric utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, that are *comparable to the rates and terms of the utility's use of its system.*
>
> (b) The *commission shall ensure that an electric utility provides nondiscriminatory access* to transmission service for qualifying facilities, exempt wholesale generators, power marketers, and other electric utilities.
>
> (c) When an electric utility provides transmission service at the request of a third party, the *commission shall ensure that the utility recovers the utility's reasonable costs in providing transmission services necessary for the transaction from the entity for which the transmission is provided* so that the utility's other customers do not bear the costs of the service.

PURA 95 § 35.004 (emphasis added). Moreover, the legislature required that municipally owned utilities ("MOUs") be regulated for purposes of wholesale competition as investor-owned utilities ("IOUs"). *See id.* § 35.001 ("In this subchapter, 'electric utility' includes a municipally owned utility.").[6]

---

the Western Systems Coordinating Council. The vast majority of Texas, however, both geographically and by population, is served by ERCOT.

5. The term "wheeling" refers to the act of transferring power over transmission lines.

6. The inclusion of MOUs by the legislature in a scheme of direct regulation by the PUC is an exception to a MOU's normal exemption from the PUC's jurisdiction. *See* PURA 95 § 32.002 ("Except as otherwise provided by this title, this subtitle does not authorize the

---

The legislature authorized the PUC to adopt rules that these goals should be accomplished:

> The [PUC] shall adopt rules relating to wholesale transmission service, rates, and access. The rules:
>
> > (1) must be consistent with the standards in this subchapter;
> >
> > (2) may not be contrary to federal law, including any applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction;
> >
> > (3) must require transmission services that are not less than the transmission services the Federal Energy Regulatory Commission may require in similar circumstances;
> >
> > (4) must require that an electric utility provide all ancillary services associated with that utility's discounted wholesale sales at the same prices and under the same terms as the services provided to a third person; and
> >
> > (5) must require that an electric utility provide all ancillary service associated with the utility's discounted wholesale sales to a third person on request.

PURA 95 § 35.006(a). The rules promulgated by the PUC to regulate access to transmission lines form the dispute in this cause.

The PUC initially proposed a rule that established a yearly access fee to be paid by all transmission-customers[7] to the PUC, which would then remit payment to transmission-providers; the access fee would be determined by (1) each transmission customer's percentage of the peak-load quantity of electricity channeled through the ERCOT grid, and (2) the transmission-provider's transmission cost of service, which consists of the actual costs to a utility of owning and operating its transmission lines. In other words, the initial rule calculated transmission-access fees by multiplying the transmission-customer's share of the electricity channeled through the grid by the transmission-provider's costs to operate its share of the infrastructure that makes up the entire grid.[8] Several commentators on the rule objected to this formula because the rate methodology charged a flat rate per megawatt of electricity to be transmitted without regard to the distance traveled. This formula has been likened to a "postage stamp" because, like first-class postage, the access fee charges the same rate for transmission of electricity regardless of the distance traveled by the electricity within the ERCOT grid.

HL & P, San Antonio, and others[9] urged a rate methodology that calculated fees based upon the distance traveled by the electricity in a wholesale transaction. They requested a distance-sensitive "impact fee" rate methodology. This method, the so-called vector-absolute-megawatt-mile ("VAMM") method, measures the impact a given wholesale transaction has on the ERCOT grid, and thus takes the distance traveled into account.[10] After the

---

commission to: (1) regulate or supervise a rate or service of a municipally owned utility; or (2) affect the jurisdiction, power, or duty of a municipality exercising exclusive original jurisdiction in that municipality's regulation and supervision of an electric utility in the municipality."); see also id. § 33.004.

7. Under the PUC's scheme, transmission-owning utilities are also transmission customers, and thus subject to the yearly access fee.

8. $T = (C)(p/P)$
   where $T$ = the transmission access fee
   $C$ = the transmission-provider's total cost of transmission

$p$ = the transmission-customer's peak load
$P$ = the peak load of ERCOT

9. Texas Utilities intervened as a plaintiff at trial but does not join in this appeal.

10. Calculating the distance electricity will travel in reaching its destination requires a constructive fiction. Electrons flow freely through the entire ERCOT grid, and will always take the path of least resistance. Therefore, the VAMM component is determined by computer modeling rather than an actual calculation of megawatts per mile (MwM).

notice and comment period had expired, the PUC promulgated a rule that calculated a "facilities charge for transmission service" according to *both* a "postage stamp" transmission *access fee* component (70%) and a distance-sensitive *impact fee* component (30%).[11] *See* 16 Tex. Admin. Code § 23.67(g)(1) (1999).

San Antonio and HL & P filed separate suits challenging the transmission rules and seeking a declaration that the rules were invalid. The two cases were consolidated. Both appellants and appellees filed motions for summary judgment. After a summary-judgment hearing, the trial court granted the cross-motions of the PUC and denied those of appellants. San Antonio and HL & P appeal, presenting four broad issues for our review: (1) whether the transmission rules exceed the PUC's statutory authority and violate PURA 95; (2) whether the PUC complied with the rule-making requirements of the Texas Administrative Procedure and Practice Act[12] in adopting the transmission rules; (3) whether the transmission rules violate the takings clause of the Fifth Amendment of the United States Constitution; and (4) whether the trial court's judgment is erroneously overbroad.

### DISCUSSION

#### The PUC's Statutory Authority

Both San Antonio and HL & P challenge the statutory authority of the PUC to promulgate the transmission rules. HL & P makes specific challenges, arguing that the chosen rate methodology violates a number of statutory requirements, most notably the "comparability" and "recovery of reasonable costs" requirements of section 35.004. *See* PURA 95 § 35.004(a), (c). We begin our analysis, however, with San Antonio's challenge to the PUC's statutory

authority to establish *any* transmission-access rate, regardless of the chosen methodology. The thrust of San Antonio's argument suggests that although the legislature clearly contemplated a role for the PUC in encouraging competition in the wholesale electricity market, the PUC's role was limited to that of an overseer of privately negotiated wholesale transactions to ensure open access and competition. San Antonio concludes that the legislature did not grant to the PUC the power to set wholesale transmission-access rates, therefore the transmission rules necessarily exceed the PUC's statutory authority. We find this argument compelling.

■■■ The cardinal rule of statutory construction is to ascertain and follow the legislature's intent. *Citizens Bank v. First State Bank*, 580 S.W.2d 344, 348 (Tex.1979); *Minton v. Frank*, 545 S.W.2d 442, 445 (Tex.1976). We ascertain this intent by looking initially at the language used in the statute. *Jones v. Del Andersen & Assocs.*, 539 S.W.2d 348, 350 (Tex. 1976); *Railroad Comm'n v. Miller*, 434 S.W.2d 670, 672 (Tex.1968). The words in the statute should be interpreted according to their ordinary meaning; they are not to be interpreted in an exaggerated, forced, or strained manner. *Howell v. Mauzy*, 899 S.W.2d 690, 704 (Tex.App.—Austin 1994, writ denied). Every word of a statute is presumed to have been used for a purpose, and every word excluded must also be presumed to have been excluded for a reason. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981); *Barr v. Bernhard*, 562 S.W.2d 844, 849 (Tex.1978).

■■■ It is axiomatic that the PUC has no inherent power, but only such powers as are delegated to it by the legislature in

---

11. $T = [ (\%)(C)(p/P) ] * [ (\%)(MwM) ]$
where $T$ = the transmission access fee
$C$ = the transmission-provider's total cost of transmission
$p$ = the transmission-customer's peak load

$P$ = the peak load of ERCOT
$MwM$ = the megawatts per mile calculated using the VAMM method

12. *See* Tex. Gov't Code Ann. §§ 2001.021–.038 (West Supp.1999).

clear and *express* statutory language, together with any implied power that may be necessary for the PUC to perform a function or duty that the legislature has required of the agency in *express* terms. *See Key W. Life Ins. Co. v. State Bd. of Ins.,* 163 Tex. 11, 350 S.W.2d 839, 848 (1961); *Coastal States Gas Prod. Co. v. Pate,* 158 Tex. 171, 309 S.W.2d 828, 831 (1958); *Sexton v. Mt. Olivet Cem. Ass'n,* 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Statutory grants of power to administrative agencies must be construed narrowly when they are claimed to authorize governmental interference with established or traditional property rights. *GTE Southwest Inc. v. Public Utility Comm'n,* 10 S.W.3d 7, 17 (Tex. App.—Austin 1999, no pet. h.); 3 *Sutherland Statutory Construction,* § 62.02 at 312 (1992).

The Texas Legislature created the PUC in 1975 with the enactment of the Public Utility Regulatory Act of 1975. *See* Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, § 1–5, 1975 Tex. Gen. Laws 2331 (Tex. Civ. Stat. Ann. art. 1446c, since amended and codified at Tex. Util.Code. Ann., tit. 2 (West 1998)). The legislature vested the PUC with the authority "to fix and regulate rates of public utilities, including rates and regulations for determining the classification of customers and services and for determining the applicability of rates." *See id.* at 2341 (since codified at PURA 95 § 36.001). The PUC thus has authority to establish rates charged to customers for the sale of electricity. *See* PURA 95 § 36.001.

■ The legislature amended PURA in 1995 to include the sections previously described. The question for this Court is whether the amendments to PURA supplied the express authority necessary for the PUC's promulgation of the transmission rules, which establish additional rates for the transmission of electricity. The power to fix prices and make rates by a board or commission cannot be conferred by implication. Such power must be conferred under statutory or constitutional language that is free from doubt, and that admits of no other reasonable construction. *Humble Oil & Refining Co. v. Railroad Comm'n,* 133 Tex. 330, 128 S.W.2d 9, 15 (1939). Based on the following analysis, we believe the legislature did *not* provide the PUC the necessary statutory authority. We look first to the legislature's intended scheme to regulate the wholesale electricity market as set out in the Texas Utility Code.

### The Texas Utility Code

■ Neither party disputes that the legislature intended to foster competition in the wholesale market for electricity; the legislature explicitly made such a finding. *See* PURA 95 § 31.001(c). However, other sections of the Utilities Code provide support for the proposition that the intended role for the PUC was one of overseer, not direct regulator of wholesale transmission rates. The legislature clearly intended that the PUC ensure that transmission access be non-discriminatory and that the rates charged for transmission access be comparable to those offered to the transmission-provider's own system. *See id.* § 35.004(a), (b). This does not necessarily imply that the legislature intended the PUC to create an entirely new system with transmission-access rates to be determined originally by the PUC, solely by a rate formula promulgated by the PUC and fixed by a PUC order.

Chapter 35, Subchapter A, entitled "Competition and Transmission Access in the Wholesale Market" contains the specific provisions pertaining to wholesale "wheeling." The subchapter, containing only nine sections, does not provide express authority to the PUC to promulgate transmission access rates. In fact, the overall structure of the subchapter supports the interpretation that the intended role of the PUC is that of final arbiter of private disputes regarding access charges. Each utility that owns or operates a trans-

mission facility must file a tariff with the appropriate state or federal regulatory agency having jurisdiction over the utility's transmission service.[13] PURA 95 § 35.007. Should a dispute arise between two parties over transmission access rates, the PUC is authorized to compel the parties to engage in alternative dispute resolution. *See* PURA 95 § 35.008 ("The commission may require that each party to a dispute concerning prices or terms of wholesale transmission service engage in a non-binding alternative dispute resolution process before seeking resolution of the dispute by the commission."). Finally, if alternative dispute resolution fails to resolve the pricing dispute, the PUC "may require an electric utility to provide transmission service at wholesale to another electric utility ... and *may determine whether terms for the transmission service are reasonable.*" PURA 95 § 35.005(a) (emphasis added). We believe the subchapter, read in context, contemplates that negotiations between parties regarding transmission-access pricing be voluntary and contractual. Should a party be dissatisfied with the outcome of the negotiations, that party may then seek the aid of the PUC, which can either order the parties to submit to alternative dispute resolution, or may settle the dispute by establishing a reasonable rate after notice and a contested-case hearing. This interpretation of the Code is bolstered by the federal example, which is specifically referenced as the model to be used by the PUC in establishing rules for wholesale power transactions.[14]

## The Federal Energy Regulatory Commission

Many of the provisions adopted by the Texas Legislature in PURA 95 were either borrowed from federal examples or expressly allude to the federal system of regulating wholesale transactions. This suggests that the statutory scheme envisioned by the Texas Legislature in PURA 95 mirrored that previously existing at the federal level, and the statutory authority the legislature granted to the PUC was intended to reach only to the extent necessary to duplicate the federal system.[15]

In 1992, Congress amended the Federal Power Act, expanding the jurisdiction of the Federal Energy Regulation Commission ("FERC") to include the authority, *upon complaint,* to order one utility to wheel power for another. *See* 16 U.S.C.A. § 824j(a) (West Supp.1999) ("Any electric utility, Federal power marketing agency, or any other person generating electric energy for sale or resale, *may apply to the Commission* for an order under this subsection requiring a transmitting utility to provide transmission services.... *No order may be issued* under this subsection *unless the applicant has made a request for transmission services to the transmitting utility* that would be the subject of such order at least 60 days prior to its

13. A tariff is defined as "A public document setting forth services of a common carrier being offered, rates and charges with respect to services, and governing rules, regulations, and practices relating to those services." *Black's Law Dictionary* 1457 (6th ed.1990).

14. Some examples of the legislature's allusion to the federal system of regulating wholesale wheeling transactions include:
"The commission may not issue a decision or rule relating to transmission service that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction." PURA 95 § 35.005(c).
"The rules may not be contrary to federal law, including any applicable decision, rule,

or policy statement of a federal regulatory agency having jurisdiction." PURA 95 § 35.006(a)(2).
"The rules must require transmission services that are not less than the transmission services the Federal Energy Regulatory Commission may require in similar circumstances." PURA 95 § 35.006(a)(3).

15. We note that Texas is unique among the continental states in having a completely intra-state power grid. Therefore, the federal scheme administered by the Federal Energy Regulation Commission governs wholesale electricity transactions in all continental states but Texas.

filing of an application for such order.") (emphasis added); *see also* 16 U.S.C.A. § 824k (West 1995 & Supp.1999). FERC does not have jurisdiction to issue an order compelling a transmission-provider to wheel power unless private negotiations have first failed. Moreover, the issuance of an order must follow public notice and an evidentiary hearing. *See id.* § 824(a). Therefore, each order must necessarily be issued on an ad hoc basis.

### The PUC's Authority to Promulgate the Transmission Rules

As we have stated, the power to fix prices and make rates by a board or commission must be conferred by statutory or constitutional language that is free from doubt, and that admits of no other reasonable construction. *Humble Oil*, 128 S.W.2d at 15. We have examined the state statutes and the federal regulatory scheme and have not found a delegation of the necessary authority. The PUC urges, however, that the legislature expressly granted to the PUC the authority to adopt rates "relating to" wholesale electric transmission rates, and that this phrasing is sufficient to confer the necessary statutory authority. *See* PURA 95 § 35.006(a) ("The commission shall adopt rules *relating to* wholesale transmission service, rates, and access.") (emphasis added).[16] The PUC argues that the statutory phrase "relating to rates" has been construed as having "a broad scope" and "an expansive sweep." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *Continental Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 278–79 (Tex.1996). The PUC contends that adopting rules "relating to rates" encompasses actual rate-making. *See Morales*, 504 U.S. at 384, 112 S.Ct. 2031; *Kiefer*, 920 S.W.2d at 279. We disagree. Such

language is not a delegation of power to fix original rates; it is only a power to regulate conduct and transactions "relating to" rates. *See Humble Oil*, 128 S.W.2d at 15.

Both *Morales* and *Kiefer* involved the Airline Deregulation Act of 1978, the relevant portion of which prohibits states from enforcing any law "relating to rates, routes or services" of any air carrier. *See* 49 U.S.C.A. § 1305(a)(1) (1992). The issue in *Morales* was "whether the Airline Deregulation Act pre-empted States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Morales*, 504 U.S. at 378, 112 S.Ct. 2031. In holding that state statutes were indeed pre-empted by the federal statute, the United States Supreme Court construed the phrase "relating to rates" expansively within the context of preserving federal supremacy. Similarly, in *Kiefer*, the Texas Supreme Court applied the holding of *Morales* to common-law personal injury claims of negligence against air carriers. *See Kiefer*, 920 S.W.2d at 275–76. The Texas Supreme Court held that common-law negligence claims were not pre-empted by the Airline Deregulation Act.

The PUC argues that the language used by these courts in *Morales* and *Kiefer*, stating that the phrase "relating to rates" should be read expansively, applies in this situation. We find these two cases to be inapposite. The instant cause involves the alleged rate-making authority granted by the Texas Legislature to a state agency, the PUC. In *Morales* and *Kiefer*, the United States and Texas Supreme Courts were analyzing the extent of federal exemption of state laws; both cases turned upon an evaluation of the interface between federal and state authority, not upon any determi-

---

**16.** Compare the legislative language conferring to the PUC the authority to regulate the rates charged to retail consumers for electricity:

  (a) The regulatory authority *may establish and regulate rates of an electric utility* and may adopt rules for determining:

    (1) the classification of customers and services; and

    (2) the applicability of rates.

  (b) A rule or order of the regulatory authority may not conflict with a ruling of a federal regulatory body.

PURA 95 § 36.001 (emphasis added).

nation of whether the legislature had granted rate-making authority to a state agency. In the Airline Deregulation Act, Congress sought to ensure that effective airline deregulation would occur by enacting a very broad and sweeping preemption to eliminate the possibility of any conflicting state regulation. In contrast, in PURA 95, the Texas Legislature had the intention of deregulating the wholesale electricity market by creating a limited scheme of regulation to ensure competition by requiring open access to transmission lines and comparable pricing. Put into the proper context, the phrases are not equivalent. Moreover, we find it incongruous that the legislature, while purporting to create greater competition in the wholesale market for electricity, would actually intend in its amendments to PURA to generate more rate regulation than the federal scheme, even while expressly referencing the federal scheme. *See* PURA 95 §§ 35.005(c); 35.006(a)(2), (a)(3).

The PUC argues that given the many legislative goals of the statute, the requirement of a uniform rate methodology for establishing transmission-access rates is the most reasonable alternative for the agency. This may be true. However, the statutory authority for the establishment of such a scheme simply does not exist at this time. *See Humble Oil*, 128 S.W.2d at 15 ("We grant that gas utility rates might more effectively be controlled if private gas producers could be compelled to sell gas to such concerns at prices determined and fixed by the Commission; but, as already indicated, that fact does not justify a court in upholding such a power in the absence of any sort of statutory authority."). We note that the legislature provided a formal channel for the PUC to "make recommendations for legislation that the commission finds appropriate to promote the public interest in the context of a partially competitive electric market." PURA 95 § 31.003(b)(3) (establishing the Report on Scope of Competition, a bi-annual report to legislature on scope of competition in electric markets and effect of competition and industry restructuring on customers). No doubt this channel may be used to request the necessary statutory authority to implement the PUC's scheme of a uniform transmission-access rate methodology.[17] However, at this time that authority does not exist. We sustain San Antonio's point of error regarding the lack of statutory authority to promulgate the transmission rules. As such, we need not address appellants' other assignments of error.

## CONCLUSION

The legislature has provided no express authority to the PUC to set the wholesale transmission rates. An examination of both the state and federal statutory schemes for the regulation of transmission access in the wholesale electricity market reveals an intent that the PUC act as an

---

17. We note that the legislature amended section 35.004 in the 1999 legislative session to include express statutory authority regarding the pricing of wholesale transmission rates according to the "postage stamp" methodology. *See* Tex. S.B. 7, 76th Leg., R.S. (1999) (to be codified at Tex. Util.Code Ann. § 35.004(d)) ("The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing...."). This new section, however, does not control the present dispute. In fact, the addition of this new and express statutory mandate regarding wholesale transmission access rates actually militates against an interpretation that the necessary authority existed prior to the 1999 amendments.

We further note that while the single subchapter detailing *wholesale* competition in the electric industry contains a mere nine sections, Senate Bill 7 from the 1999 legislative session restructuring the *retail* portion of the electric industry creates an additional three chapters (Chapter 39. Restructuring of Electric Utility Industry; Chapter 40. Competition for Municipally Owned Utilities; Chapter 41. Electric Cooperatives and Competition), encompassing more than 125 sections. While not dispositive of the legislature's intention in delegating authority to the PUC, the skeletal nature of the former stands in stark contrast to the specific structure established by the legislature in the latter.

arbiter of disputes arising from privately negotiated contracts. Because the transmission rules exceed the statutory authority granted to the PUC, we reverse the order of the trial court and render judgment that the rate-setting portions of the wholesale transmission rules are invalid.[18]

---

**18.** On motion for rehearing the parties concur that this holding by the Court can be accomplished by severing the following portions of the rules and declaring them invalid: subsections (f), (g), (h), (i), (j). and (m) of Rule 23.67 and subsections (j) and (o) of Rule 23.70. Judgment will be rendered accordingly.