TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-02-00547-CV






Public Utility Commission of Texas and South Texas Electric Cooperative, Inc., Appellants


v.


City Public Service Board of San Antonio, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. 97-11665, HONORABLE PAUL DAVIS, JUDGE PRESIDING





O P I N I O N




 In this appeal, we must decide whether the Public Utility Commission exceeded its
statutory authority by conducting a proceeding to determine the transmission cost of service (TCOS)
for the City Public Service Board of San Antonio (San Antonio) as a part of its regulatory oversight
of the wholesale energy market under the Public Utility Regulatory Act of 1995 (PURA 95). A
utility's TCOS includes all reasonable and necessary expenses, plus a reasonable return on
investments, associated with owning and operating its transmission network. The Commission held 
individual TCOS proceedings for every utility in the statewide power-transmission grid. Then, the
Commission proceeded to use the utilities' TCOS numbers to set statewide rates for use of
transmission lines in wholesale energy transactions. While the Commission was conducting these
proceedings, San Antonio brought a declaratory-judgment action challenging the Commission's
authority to enact a wholesale rate-setting scheme under PURA 95. San Antonio eventually
prevailed when the supreme court declared the rate-setting rules to be invalid. See Public Util.
Comm'n v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 325 (Tex. 2001). Relying on the
supreme-court decision, the district court "reversed and vacated" the Commission's order in San
Antonio's TCOS case. The Commission appeals, (1) contending that although it cannot use the TCOS
numbers to set rates, it can use them to carry out its other responsibilities under PURA 95. Because
we think that determining a utility's TCOS number is tantamount to setting its transmission-service
rates, we affirm the district court's judgment reversing the Commission's order.


BACKGROUND Texas utilities have voluntarily interconnected their regional transmission networks 
to form a single grid called the Electric Reliability Council of Texas (ERCOT). When power is sold
in a wholesale transaction, it is transported over this ERCOT grid. Prior to PURA 95, utilities whose
transmission networks were directly connected within the grid could sell power to one another in
"bundled" transactions which used a single rate to cover generation, transmission, and distribution
services. However, not all wholesale transactions were between utilities with directly connected
networks; many such transactions required power to be transmitted or "wheeled" over the networks
of other utilities. In these cases, payments to the wheeling utilities were negotiated on a case-by-case
basis. PURA 95 eliminates these distinctions and requires utilities to offer nondiscriminatory access
to their transmission facilities and to charge uniform rates for such access.


PURA 95

 In 1995, the legislature amended PURA to promote competition in the wholesale
electricity market. See Act of May 28, 1995, 74th Leg., R.S., ch. 765, § 2.01(a), 1995 Tex. Gen.
Laws 3972, 3988-89 (codified at Tex. Util. Code Ann. § 31.001(c)). The centerpiece of PURA 95's
wholesale-deregulation scheme is a requirement that electric utilities provide open access to their
transmission facilities. See id. § 2.08, 1995 Tex. Gen. Laws at 4000 (Tex. Util. Code Ann. § 35.004,
since amended). In this open-access regime, each utility must provide transmission service at rates
and terms comparable to what it costs the utility to operate its own system. Id. This requires the
utilities to separate or "unbundle" the costs associated with their transmission facilities from the
costs associated with their generation and distribution facilities.

 PURA 95 gives the Commission several responsibilities related to oversight of the
transmission-service market. The Commission is directed to ensure that each utility provide
transmission service in a nondiscriminatory manner, and recover its reasonable costs in providing
such transmission service so that the utility's other customers are not required to bear those costs. 
See id. PURA 95 also provides that "[t]he [C]ommission may require a utility . . . to provide
transmission service at wholesale to another utility . . . and may determine whether the terms and
conditions for the transmission service are reasonable." See id. § 2.07, 1995 Tex. Gen. Laws at 3999
(Tex. Util. Code Ann. § 35.005, since amended). Moreover, the Commission is authorized to require
parties with wholesale-transmission disputes to submit to nonbinding alternative dispute resolution. 
See Tex. Util. Code Ann. § 35.008 (West 1998). In order to fulfill these responsibilities, the
Commission must "adopt rules relating to wholesale transmission service, rates, and terms." See
id. § 35.006(a) (emphasis added). Utilities that own transmission facilities are, in turn, required to
"file a tariff in compliance with [C]ommission rules." See id. § 35.007(a). 


The Rules

 The Commission adopted rules governing wholesale-transmission in 1996. See 21
Tex. Reg. 1397 (1996), adopting 16 Tex. Admin. Code § 23.67 [hereinafter Rule 23.67], and 21
Tex. Reg. 3343 (1996), adopting 16 Tex. Admin. Code 23.70 [hereinafter Rule 23.70]. These rules
required each ERCOT utility to pay every other ERCOT utility a "facilities charge" for transmission
service. See Rule 23.67(g). Each ERCOT utility was to pay this facilities charge in its capacity as
a transmission customer, and to receive a portion of the facilities charges paid by other utilities in
its capacity as a transmission provider. This facilities charge had two components, an "impact fee"
and an "access fee." See Rule 23.67(g)(1). The impact fee made up thirty percent of the facilities
charge and was calculated based upon the distance traveled by the electricity in the transmission
customer's wholesale transactions. See id.; Rule 23.70(o); City Pub. Serv. Bd. v. Public Util.
Comm'n, 9 S.W.3d 868, 872-73 (Tex. App.--Austin 2000), aff'd, 53 S.W.3d 310 (Tex. 2001). The
access fee, which made up the remaining seventy percent of the facilities charge, was not distance
sensitive. The yearly access fee paid by each utility in its capacity as a transmission customer was
to be based on its percentage of use of the ERCOT grid. More precisely, the access fee was to reflect
the transmission customer's percentage of the peak-load quantity of electricity channeled through
the ERCOT grid, applied to the TCOS for the entire grid. See City Pub. Serv. Bd., 53 S.W.3d at 314;
City Pub. Serv. Bd., 9 S.W.3d at 872; Rule 23.67(g). To calculate access fees, the Commission was
first to determine each ERCOT utility's TCOS, which consists of its reasonable and necessary
expenses, plus a reasonable return on its investments, related to owning and operating transmission
lines. The Commission was to aggregate those costs to arrive at the TCOS for the entire grid. The
Commission was then to determine the maximum amount of electricity carried on the grid at any one
time during the relevant period, or its "total peak load" and each utility's percentage of that total. 
City Pub. Serv. Bd., 53 S.W.3d at 314; see City Pub. Serv. Bd., 9 S.W.3d at 872; Rule 23.67(g)(1),
(5). Each transmission customer's access fee was then calculated by multiplying its percentage of
the aggregate peak load for the ERCOT grid by the TCOS for the entire grid. City Pub. Serv. Bd.,
53 S.W.3d at 314; see Rule 23.67(g)(1). Relatedly, the amount that each ERCOT utility received
in its capacity as a transmission provider was to be determined by its individual TCOS as a
percentage of the aggregate TCOS for the entire grid.

 To set transmission rates pursuant to its rules, the Commission initiated a series of
individual proceedings to determine the TCOS for each ERCOT utility. It also initiated a companion
generic proceeding to resolve common issues and set the transmission rates using the costs
determined in the individual cases. The generic proceeding and the individual proceedings worked
together. The Commission issued a preliminary order separating the general issues to be determined
in the generic proceeding from the utility-specific issues to be determined in the individual
proceedings. Once the TCOS numbers were determined in the individual proceedings, the
Commission used those numbers in the generic proceeding to set transmission-service rates--i.e.,
to determine the exact amount that each ERCOT utility was to pay every other ERCOT utility
according to the formula described above.


San Antonio's Challenge to the Rules

 While these proceedings were taking place, San Antonio and Houston Lighting and
Power Company each filed declaratory-judgment actions claiming that the Commission had
exceeded its statutory authority in promulgating its wholesale-transmission rules. The causes were
consolidated and the trial court ruled in favor of the Commission. This court then reversed the trial
court, agreeing with the utilities that the Commission had exceeded its authority in promulgating its
rules. See City Pub. Serv. Bd., 9 S.W.3d at 877-78. We reasoned that PURA 95 did not grant the
Commission authority to establish any transmission-access rate, regardless of the methodology. 
See id. at 873. In reaching this conclusion, we explained that PURA 95 gave the Commission
oversight of wholesale transmission service, but not the authority to set rates initially:


We believe that the subchapter [dealing with wholesale transmission service], read
in context, contemplates that negotiations between parties regarding transmission-access pricing be voluntary and contractual. Should a party be dissatisfied with the
outcome of the negotiations, that party may then seek the aid of the [Commission],
which can either order the parties to submit to alternative dispute resolution, or may
settle the dispute by establishing a reasonable rate after notice and a contested-case
hearing.



See id. at 875. The supreme court affirmed, agreeing that PURA 95 does not grant the Commission
authority to set wholesale transmission rates for municipally owned utilities such as San Antonio,
which are not otherwise subject to the Commission's traditional ratemaking authority. (2) It further
elaborated on the Commission's oversight role in resolving disputes between the requesting and
providing utilities in a way that ensures that the transmission provider is offering nondiscriminatory
access to its network at a reasonable rate and that the transmission provider's customers are not
unfairly bearing the transmission costs inflicted by the requesting utility. See City Pub. Serv. Bd.,
53 S.W.3d at 320. The Commission does not have the power to set wholesale transmission rates as
an initial matter, but once a dispute arises, it can either refer the parties to alternative dispute
resolution, or it can set a reasonable rate to resolve that dispute. Id. The supreme court added that
the Commission has the independent ability to order utilities to appear before it even without a
dispute to ensure that they are providing non-discriminatory access and to protect their customers
from bearing others' transmission costs. 


San Antonio's TCOS Case

 While the declaratory-judgment action was on appeal, San Antonio sought judicial
review of its TCOS as determined by the Commission after the contested-case proceeding. See Tex.
Gov't Code Ann. § 2001.171 (West 2000). San Antonio alleged that the Commission had ignored
or underestimated certain portions of its transmission costs and had therefore set a TCOS number
that was too low. The district court initially affirmed the Commission's order. But shortly after we
declared the transmission rules invalid in the declaratory-judgment appeal, the district court granted
San Antonio's motion for new trial, vacated its earlier judgment, and abated the cause pending the
final resolution of the declaratory-judgment action. Once the supreme court ruled that the
transmission rules were invalid, the district court conducted a new hearing and received additional
briefing to review San Antonio's TCOS. San Antonio argued that the Commission's order setting
its TCOS should be vacated and declared void and invalid for lack of agency authority. The
Commission argued that the court should affirm the agency order. (3) The district court vacated the
Commission's order, declaring it to be "void and invalid as exceeding the authority and jurisdiction
of the [Commission]." On appeal, the Commission asserts that although the TCOS proceedings were
initially conducted as part of a rate-setting scheme, it has other responsibilities that empower it to
determine the TCOS of individual utilities.


DISCUSSION

 This is a suit for judicial review of a Commission decision made after a contested
case. See Tex. Util. Code Ann. § 15.001 (West 1998); Tex. Gov't Code Ann. § 2001.171 (West
2000). The trial court was therefore authorized to reverse the case if the agency's findings,
inferences, conclusions, or decisions were in excess of the agency's statutory authority. See Tex.
Gov't Code Ann. § 2001.174(2)(B). This ground for reversal presents a question of law that we
review de novo. See Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, 24 S.W.3d
893, 898 (Tex. App.--Austin 2000), rev'd on other grounds, 92 S.W.3d 477 (Tex. 2002). The
Commission has only those powers conferred upon it by the legislature in clear and unmistakable
language. City Pub. Serv. Bd., 53 S.W.3d at 315-16; Public Util. Comm'n v. GTE-Southwest, Inc.,
901 S.W.2d 401, 407 (Tex. 1995). When the legislature expressly confers a power on an agency,
it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its
express functions or duties. See GTE-Southwest, Inc., 901 S.W.2d at 407. An agency may not,
however, exercise what is effectively a new power on the theory that such exercise is expedient for
the agency's purposes. See id. 

 The Commission concedes that at the time it conducted San Antonio's contested-case
proceeding, it intended to use the TCOS number to set rates in the generic rate proceeding--a use
beyond its statutory authority. However, the Commission asserts that the reviewing court is not
bound by the reasons given in an agency order and may affirm if there is any valid legal basis for the
agency action. See Central Power & Light Co. v. Public Util. Comm'n, 36 S.W.3d 547, 559 (Tex.
App.--Austin 2000, pet. denied). The Commission argues that the oversight responsibilities
contemplated by PURA 95 invest it with the authority to initiate a proceeding to determine San
Antonio's TCOS, even though it may not impose rates. San Antonio rejoins that determining a
utility's TCOS is tantamount to setting its transmission rates. We agree that the TCOS case was an
integral part of the invalid rate-setting scheme. (4)

 Under traditional electric-utility regulation, large, vertically integrated utilities
operated as monopolies in the areas they served. These utilities would generate, transmit, and retail
electricity to end-use customers. The Commission was authorized to set rates for each investor-owned utility at a level that would allow it to recoup its prudently incurred costs and to earn a
reasonable return on its investments. See id. at 553; 16 Tex. Admin. Code §§ 25.231, .235(a) (2002). 
The TCOS determination applies these same rate-setting principles to the wholesale transmission
market. That is, the final TCOS number represents the utility's reasonable and necessary expenses,
together with a reasonable return on its prudently invested capital, involved in operating its
transmission facilities. As San Antonio points out, this number is the first and most essential part
of establishing a final rate--it sets the amount to be recovered. The only thing left to do is apply
some methodology that determines how the amount is to be recovered. Before its rules were
invalidated, the Commission used the formula described above as its rate-setting methodology. 

 Because the Commission admits that it initiated the TCOS proceeding for a purpose
that was undoubtedly beyond the scope of its authority--to set rates as an initial matter--its final
order must be reversed unless it had some independent basis of authority to initiate such a case. The
Commission asks us to find such authority in its oversight responsibilities. It claims that it cannot
determine whether San Antonio is providing reasonable rates or being forced to subsidize other
utilities without first knowing the costs associated with its provision of transmission service. The
Commission also argues that its authority to oversee San Antonio's separation of functions
encompasses the authority to determine its TCOS. (5) We reject the Commission's arguments.

 The supreme court clearly held that the Commission was not authorized to set rates
for municipally-owned utilities outside of a dispute-resolution context. See City Pub. Serv. Bd., 53
S.W.3d at 320. In so holding, it explicitly referenced the Commission's oversight responsibilities
in a context that contrasted them with rate-setting. See id 320-21. It would elevate form over
substance for us to hold that although the Commission cannot set San Antonio's rates, it can
nonetheless determine, to the penny, the precise amount of San Antonio's reasonable and necessary
expenses together with a reasonable return on its prudently invested capital--i.e., the precise amount
it would be allowed to recover if the Commission were to set rates. To allow the Commission to
develop this number apart from its role of resolving a dispute, and to "use" it to check
reasonableness or conduct its other oversight functions bears too close a nexus to actual rate-setting
to withstand scrutiny. 

 The Commission asks us to draw a hypertechnical distinction between determining
San Antonio's TCOS and determining how San Antonio's TCOS is to be recovered. We recognize
that, in carrying out its oversight responsibilities, the Commission must take some measure of the
costs associated with San Antonio's transmission facilities; however, such authority simply cannot
encompass an initial determination of a municipal utility's TCOS, which is tantamount to an initial
determination of its wholesale transmission rates. (6) We hold that the Commission was without
authority to conduct TCOS proceedings for municipally owned utilities such as San Antonio, and
overrule the Commission's single issue. (7)

 Upon finding that the Commission had exceeded its statutory authority in conducting 
its TCOS proceeding, the district court "reversed and vacated" the Commission's order, which it
found to be "void and invalid" as exceeding the Commission's authority. This is a suit for judicial
review governed by section 2001.174 of the government code. That section authorizes the trial court
to reverse and remand if the agency's findings, inferences, conclusions, or decisions exceeded its
statutory authority. See Tex. Gov't Code Ann. § 2001.174(2)(B); Texas State Bd. of Pharmacy v.
Seely, 764 S.W.2d 806, 815 (Tex. App.--Austin 1988, writ denied) (holding that remand is proper
judgment following reversal of agency order). The court was not, in these circumstances, authorized
to vacate the agency's order. See BFI Waste Sys., Inc. v. Martinez Envtl. Group, 93 S.W.3d 570, 581
(Tex. App.--Austin 2002, pet. filed). 


CONCLUSION

 The Commission was without authority to determine San Antonio's TCOS apart
from a dispute which would entitle it to set rates. Because the appropriate remedy in this case was
reversal and remand to the Commission, we modify the judgment of the trial court to reverse the
agency order and remand the case to the agency. As modified, we affirm the trial-court judgment.



 

 Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Yeakel

Modified and, as Modified, Affirmed

Filed: April 24, 2003

1. In addition to the Commission, an intervenor, South Texas Electric Cooperative, Inc., urges
us to reverse the trial court's judgment. Because its arguments are substantially the same as the
Commission's, we will treat them together.
2. The supreme court did, however, find that the traditional, broad power of the Commission
to "establish and regulate" rates for investor-owned utilities, such as Houston Lighting and Power
Company, encompassed the power to set wholesale transmission rates for those utilities. The court
nonetheless affirmed our invalidation of the rules with respect to investor-owned utilities on the
ground that the access fee violates the provisions of PURA 95 prohibiting subsidies among utilities
and requiring that rates for wholesale transmission service be comparable to each utility's use of its
own system. See Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 323-24
(Tex. 2001).
3. The Commission also argued that district court was not authorized to vacate the order but
could only reverse and remand to the agency. See Tex. Gov't Code Ann. § 2001.174 (West 2000).
4. In 1999, the legislature amended PURA and authorized the Commission to set wholesale
transmission rates using a method similar to that invalidated by the supreme court. See Tex. Util.
Code Ann. § 35.004(d) (West Supp. 2003). In this opinion, however, we are concerned only with
the authority of the Commission to determine a utility's TCOS when it issued its final order in 1997. 
 
5. To support this claim, it cites to a rule requiring utilities to make filings with the
Commission separating out their costs and rates, based on the costs associated with their generation,
transmission, and distribution operations. In the declaratory-judgment case, the supreme court
referred to this rule as an example of Commission authority to "adopt rules relating to wholesale
transmission service, rates, and access"--which the Commission was entitled to do under PURA 95. 
See City Pub. Serv. Bd., 53 S.W.2d at 319. The Commission apparently argues that the separation
of a utility's "costs and rates" associated with it transmission operations from the "costs and rates"
associated with its generation and distribution operations requires a determination of a utility's
TCOS. 
6. We note that even if a determination of a utility's TCOS number were conceptually
distinct, in some meaningful way, from setting its rates initially, there surely would be little or no
practical distinction in situations where a utility attempts to charge a rate that would allow it to
recover more than its predetermined TCOS. Such a rate would immediately be "disputed" by its
transmission customers and the Commission could then step in to resolve this manufactured dispute
by setting a rate.
7. The Commission also attempts to argue that this very TCOS proceeding, where San
Antonio's costs were disputed by several intervening utilities, represents a dispute that it can resolve
by setting reasonable rates. This circular argument has no merit, as such disputes only arose in the
context of this invalid rate-setting procedure.