# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00547-CV

**Public Utility Commission of Texas and South Texas Electric Cooperative, Inc., Appellants**

**v.**

**City Public Service Board of San Antonio, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. 97-11665, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

In this appeal, we must decide whether the Public Utility Commission exceeded its statutory authority by conducting a proceeding to determine the transmission cost of service (TCOS) for the City Public Service Board of San Antonio (San Antonio) as a part of its regulatory oversight of the wholesale energy market under the Public Utility Regulatory Act of 1995 (PURA 95). A utility=s TCOS includes all reasonable and necessary expenses, plus a reasonable return on investments, associated with owning and operating its transmission network. The Commission held individual TCOS proceedings for every utility in the statewide power-transmission grid. Then, the Commission proceeded to use the utilities= TCOS numbers to set statewide rates for use of transmission lines in wholesale energy transactions. While the

Commission was conducting these proceedings, San Antonio brought a declaratory-judgment action challenging the Commission=s authority to enact a wholesale rate-setting scheme under PURA 95. San Antonio eventually prevailed when the supreme court declared the rate-setting rules to be invalid. *See Public Util. Comm=n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 325 (Tex. 2001). Relying on the supreme-court decision, the district court Areversed and vacated@ the Commission=s order in San Antonio=s TCOS case. The Commission appeals,[1] contending that although it cannot use the TCOS numbers to set rates, it can use them to carry out its other responsibilities under PURA 95. Because we think that determining a utility=s TCOS number is tantamount to setting its transmission-service rates, we affirm the district court=s judgment reversing the Commission=s order.

## BACKGROUND

Texas utilities have voluntarily interconnected their regional transmission networks to form a single grid called the Electric Reliability Council of Texas (ERCOT). When power is sold in a wholesale transaction, it is transported over this ERCOT grid. Prior to PURA 95, utilities whose transmission networks were directly connected within the grid could sell power to one another in Abundled@ transactions which used a single rate to cover generation, transmission, and distribution services. However, not all

---

[1] In addition to the Commission, an intervenor, South Texas Electric Cooperative, Inc., urges us to reverse the trial court=s judgment. Because its arguments are substantially the same as the Commission=s, we will treat them together.

wholesale transactions were between utilities with directly connected networks; many such transactions required power to be transmitted or Awheeled@ over the networks of other utilities. In these cases, payments to the wheeling utilities were negotiated on a case-by-case basis. PURA 95 eliminates these distinctions and requires utilities to offer nondiscriminatory access to their transmission facilities and to charge uniform rates for such access.

### PURA 95

In 1995, the legislature amended PURA to promote competition in the wholesale electricity market. *See* Act of May 28, 1995, 74th Leg., R.S., ch. 765, ' 2.01(a), 1995 Tex. Gen. Laws 3972, 3988-89 (codified at Tex. Util. Code Ann. ' 31.001(c)). The centerpiece of PURA 95=s wholesale-deregulation scheme is a requirement that electric utilities provide open access to their transmission facilities. *See id.* ' 2.08, 1995 Tex. Gen. Laws at 4000 (Tex. Util. Code Ann. ' 35.004, since amended). In this open-access regime, each utility must provide transmission service at rates and terms comparable to what it costs the utility to operate its own system. *Id.* This requires the utilities to separate or Aunbundle@ the costs associated with their transmission facilities from the costs associated with their generation and distribution facilities.

PURA 95 gives the Commission several responsibilities related to oversight of the transmission-service market. The Commission is directed to ensure that each utility provide transmission service in a nondiscriminatory manner, and recover its reasonable costs in providing such transmission service so that the utility=s other customers are not required to bear those costs. *See id.* PURA 95 also

3

provides that A[t]he [C]ommission may require a utility . . . to provide transmission service at wholesale to another utility . . . and may determine whether the terms and conditions for the transmission service are reasonable.@ *See id.* ' 2.07, 1995 Tex. Gen. Laws at 3999 (Tex. Util. Code Ann. ' 35.005, since amended). Moreover, the Commission is authorized to require parties with wholesale-transmission disputes to submit to nonbinding alternative dispute resolution. *See* Tex. Util. Code Ann. ' 35.008 (West 1998). In order to fulfill these responsibilities, the Commission must Aadopt rules *relating to* wholesale transmission service, rates, and terms.@ *See id.* ' 35.006(a) (emphasis added). Utilities that own transmission facilities are, in turn, required to Afile a tariff in compliance with [C]ommission rules.@ *See id.* ' 35.007(a).

### *The Rules*

The Commission adopted rules governing wholesale-transmission in 1996. *See* 21 Tex. Reg. 1397 (1996), adopting 16 Tex. Admin. Code ' 23.67 [hereinafter Rule 23.67], *and* 21 Tex. Reg. 3343 (1996), adopting 16 Tex. Admin. Code 23.70 [hereinafter Rule 23.70]. These rules required each ERCOT utility to pay every other ERCOT utility a Afacilities charge@ for transmission service. *See* Rule 23.67(g). Each ERCOT utility was to pay this facilities charge in its capacity as a transmission customer, and to receive a portion of the facilities charges paid by other utilities in its capacity as a transmission provider. This facilities charge had two components, an Aimpact fee@ and an Aaccess fee.@ *See* Rule 23.67(g)(1). The impact fee made up thirty percent of the facilities charge and was calculated based upon the distance traveled by the electricity in the transmission customer=s wholesale transactions. *See id.*; Rule 23.70(o); *City Pub. Serv. Bd. v. Public Util. Comm=n*, 9 S.W.3d 868, 872-73 (Tex. App.CAustin

4

2000), *aff=d*, 53 S.W.3d 310 (Tex. 2001). The access fee, which made up the remaining seventy percent of the facilities charge, was not distance sensitive. The yearly access fee paid by each utility in its capacity as a transmission customer was to be based on its percentage of use of the ERCOT grid. More precisely, the access fee was to reflect the transmission customer=s percentage of the peak-load quantity of electricity channeled through the ERCOT grid, applied to the TCOS for the entire grid. *See City Pub. Serv. Bd.*, 53 S.W.3d at 314; *City Pub. Serv. Bd.*, 9 S.W.3d at 872; Rule 23.67(g). To calculate access fees, the Commission was first to determine each ERCOT utility=s TCOS, which consists of its reasonable and necessary expenses, plus a reasonable return on its investments, related to owning and operating transmission lines. The Commission was to aggregate those costs to arrive at the TCOS for the entire grid. The Commission was then to determine the maximum amount of electricity carried on the grid at any one time during the relevant period, or its Atotal peak load@ and each utility=s percentage of that total. *City Pub. Serv. Bd.*, 53 S.W.3d at 314; *see City Pub. Serv. Bd.*, 9 S.W.3d at 872; Rule 23.67(g)(1), (5). Each transmission customer=s access fee was then calculated by multiplying its percentage of the aggregate peak load for the ERCOT grid by the TCOS for the entire grid. *City Pub. Serv. Bd.*, 53 S.W.3d at 314; *see* Rule 23.67(g)(1). Relatedly, the amount that each ERCOT utility received in its capacity as a transmission provider was to be determined by its individual TCOS as a percentage of the aggregate TCOS for the entire grid.

To set transmission rates pursuant to its rules, the Commission initiated a series of individual proceedings to determine the TCOS for each ERCOT utility. It also initiated a companion generic proceeding to resolve common issues and set the transmission rates using the costs determined in the

individual cases. The generic proceeding and the individual proceedings worked together. The Commission issued a preliminary order separating the general issues to be determined in the generic proceeding from the utility-specific issues to be determined in the individual proceedings. Once the TCOS numbers were determined in the individual proceedings, the Commission used those numbers in the generic proceeding to set transmission-service ratesC*i.e.*, to determine the exact amount that each ERCOT utility was to pay every other ERCOT utility according to the formula described above.

### San Antonio≡s Challenge to the Rules

While these proceedings were taking place, San Antonio and Houston Lighting and Power Company each filed declaratory-judgment actions claiming that the Commission had exceeded its statutory authority in promulgating its wholesale-transmission rules. The causes were consolidated and the trial court ruled in favor of the Commission. This court then reversed the trial court, agreeing with the utilities that the Commission had exceeded its authority in promulgating its rules. *See City Pub. Serv. Bd.*, 9 S.W.3d at 877-78. We reasoned that PURA 95 did not grant the Commission authority to establish *any* transmission-access rate, regardless of the methodology. *See id.* at 873. In reaching this conclusion, we explained that PURA 95 gave the Commission oversight of wholesale transmission service, but not the authority to set rates initially:

> We believe that the subchapter [dealing with wholesale transmission service], read in context, contemplates that negotiations between parties regarding transmission-access pricing be voluntary and contractual. Should a party be dissatisfied with the outcome of the negotiations, that party may then seek the aid of the [Commission], which can either order

**6**

the parties to submit to alternative dispute resolution, or may settle the dispute by establishing a reasonable rate after notice and a contested-case hearing.

*See id.* at 875. The supreme court affirmed, agreeing that PURA 95 does not grant the Commission authority to set wholesale transmission rates for municipally owned utilities such as San Antonio, which are not otherwise subject to the Commission=s traditional ratemaking authority.[2] It further elaborated on the Commission=s oversight role in resolving disputes between the requesting and providing utilities in a way that ensures that the transmission provider is offering nondiscriminatory access to its network at a reasonable rate and that the transmission provider=s customers are not unfairly bearing the transmission costs inflicted by the requesting utility. *See City Pub. Serv. Bd.*, 53 S.W.3d at 320. The Commission does not have the power to set wholesale transmission rates as an initial matter, but once a dispute arises, it can either refer the parties to alternative dispute resolution, or it can set a reasonable rate to resolve that dispute. *Id.* The supreme court added that the Commission has the independent ability to order utilities to appear before it

---

[2] The supreme court did, however, find that the traditional, broad power of the Commission to Aestablish and regulate@ rates for investor-owned utilities, such as Houston Lighting and Power Company, encompassed the power to set wholesale transmission rates for those utilities. The court nonetheless affirmed our invalidation of the rules with respect to investor-owned utilities on the ground that the access fee violates the provisions of PURA 95 prohibiting subsidies among utilities and requiring that rates for wholesale transmission service be comparable to each utility=s use of its own system. *See Public Util. Comm=n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 323-24 (Tex. 2001).

even without a dispute to ensure that they are providing non-discriminatory access and to protect their customers from bearing others= transmission costs.

*San Antonio=s TCOS Case*

While the declaratory-judgment action was on appeal, San Antonio sought judicial review of its TCOS as determined by the Commission after the contested-case proceeding. *See* **Tex. Gov=t Code Ann. ' 2001.171 (West 2000).** San Antonio alleged that the Commission had ignored or underestimated certain portions of its transmission costs and had therefore set a TCOS number that was too low. The district court initially affirmed the Commission=s order. But shortly after we declared the transmission rules invalid in the declaratory-judgment appeal, the district court granted San Antonio=s motion for new trial, vacated its earlier judgment, and abated the cause pending the final resolution of the declaratory-judgment action. Once the supreme court ruled that the transmission rules were invalid, the district court conducted a new hearing and received additional briefing to review San Antonio=s TCOS. San Antonio argued that the Commission=s order setting its TCOS should be vacated and declared void and invalid for lack of agency authority. The Commission argued that the court should affirm the agency order.[3] The district court vacated the Commission=s order, declaring it to be Avoid and invalid as exceeding the authority and jurisdiction of the [Commission].@ On appeal, the Commission asserts that although the

---

[3] The Commission also argued that district court was not authorized to vacate the order but could only reverse and remand to the agency. *See* **Tex. Gov=t Code Ann. ' 2001.174 (West 2000).**

TCOS proceedings were initially conducted as part of a rate-setting scheme, it has other responsibilities that empower it to determine the TCOS of individual utilities.

## DISCUSSION

This is a suit for judicial review of a Commission decision made after a contested case. *See* Tex. Util. Code Ann. ' 15.001 (West 1998); Tex. Gov=t Code Ann. ' 2001.171 (West 2000). The trial court was therefore authorized to reverse the case if the agency=s findings, inferences, conclusions, or decisions were in excess of the agency=s statutory authority. *See* Tex. Gov=t Code Ann. ' 2001.174(2)(B). This ground for reversal presents a question of law that we review *de novo*. *See Texas Dep=t of Transp. v. Jones Bros. Dirt & Paving Contractors*, 24 S.W.3d 893, 898 (Tex. App.C Austin 2000), *rev=d on other grounds*, 92 S.W.3d 477 (Tex. 2002). The Commission has only those powers conferred upon it by the legislature in clear and unmistakable language. *City Pub. Serv. Bd.*, 53 S.W.3d at 315-16; *Public Util. Comm=n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995). When the legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *See GTE-Southwest, Inc.*, 901 S.W.2d at 407. An agency may not, however, exercise what is effectively a new power on the theory that such exercise is expedient for the agency=s purposes. *See id.*

The Commission concedes that at the time it conducted San Antonio=s contested-case proceeding, it intended to use the TCOS number to set rates in the generic rate

9

proceeding**C**a use beyond its statutory authority.  However, the Commission asserts that the reviewing court is not bound by the reasons given in an agency order and may affirm if there is any valid legal basis for the agency action.  *See Central Power & Light Co. v. Public Util. Comm=n*, 36 S.W.3d 547, 559 (Tex. App.**C**Austin 2000, pet. denied).  The Commission argues that the oversight responsibilities contemplated by PURA 95 invest it with the authority to initiate a proceeding to determine San Antonio=s TCOS, even though it may not impose rates.  San Antonio rejoins that determining a utility=s TCOS is tantamount to setting its transmission rates.  We agree that the TCOS case was an integral part of the invalid rate-setting scheme.[4]

Under traditional electric-utility regulation, large, vertically integrated utilities operated as monopolies in the areas they served.  These utilities would generate, transmit, and retail electricity to end-use customers.  The Commission was authorized to set rates for each investor-owned utility at a level that would allow it to recoup its prudently incurred costs and to earn a reasonable return on its investments.  *See id.* at 553; 16 Tex. Admin. Code **' '** 25.231, .235(a) (2002).  The TCOS determination applies these same rate-setting principles to the wholesale transmission market.  That is, the final TCOS number represents the utility=s

---

[4] In 1999, the legislature amended PURA and authorized the Commission to set wholesale transmission rates using a method similar to that invalidated by the supreme court.  *See* Tex. Util. Code Ann. **'** 35.004(d) (West Supp. 2003).  In this opinion, however, we are concerned only with the authority of the Commission to determine a utility=s TCOS when it issued its final order in 1997.

**reasonable and necessary expenses, together with a reasonable return on its prudently invested capital, involved in operating its transmission facilities. As San Antonio points out, this number is the first and most essential part of establishing a final rate—it sets the amount to be recovered. The only thing left to do is apply some methodology that determines *how* the amount is to be recovered. Before its rules were invalidated, the Commission used the formula described above as its rate-setting methodology.**

Because the Commission admits that it initiated the TCOS proceeding for a purpose that was undoubtedly beyond the scope of its authority—to set rates as an initial matter—its final order must be reversed unless it had some independent basis of authority to initiate such a case. The Commission asks us to find such authority in its oversight responsibilities. It claims that it cannot determine whether San Antonio is providing reasonable rates or being forced to subsidize other utilities without first knowing the costs associated with its provision of transmission service. The Commission also argues that its authority to oversee San Antonio=s separation of functions encompasses the authority to determine its TCOS.[5] We reject the Commission=s arguments.

---

[5] To support this claim, it cites to a rule requiring utilities to make filings with the Commission separating out their costs and rates, based on the costs associated with their generation, transmission, and distribution operations. In the declaratory-judgment case, the supreme court referred to this rule as an example of Commission authority to Aadopt rules *relating to* wholesale transmission service, rates, and

access@C which the Commission was entitled to do under PURA 95. *See City Pub. Serv. Bd.*, 53 S.W.2d at 319. The Commission apparently argues that the separation of a utility=s Acosts and rates@ associated with it transmission operations from the Acosts and rates@ associated with its generation and distribution operations requires a determination of a utility=s TCOS.

The supreme court clearly held that the Commission was not authorized to set rates for municipally-owned utilities outside of a dispute-resolution context. *See City Pub. Serv. Bd.*, 53 S.W.3d at 320. In so holding, it explicitly referenced the Commission=s oversight responsibilities in a context that *contrasted* them with rate-setting. *See id* 320-21. It would elevate form over substance for us to hold that although the Commission cannot set San Antonio=s rates, it can nonetheless determine, to the penny, the precise amount of San Antonio=s **reasonable and necessary expenses together with a reasonable return on its prudently invested capital**C*i.e.*, the precise amount it would be allowed to recover if the Commission were to set rates. To allow the Commission to develop this number apart from its role of resolving a dispute, and to Ause@ it to check reasonableness or conduct its other oversight functions bears too close a nexus to actual rate-setting to withstand scrutiny.

The Commission asks us to draw a hypertechnical distinction between determining San Antonio=s TCOS and determining *how* San Antonio=s TCOS is to be recovered. We recognize that, in carrying out its oversight responsibilities, the Commission must take some measure of the costs associated with San Antonio=s transmission facilities; however, such authority simply cannot encompass an initial determination of a municipal utility=s TCOS, which is tantamount to an initial determination of its wholesale

**13**

transmission rates.[6] We hold that the Commission was without authority to conduct TCOS proceedings for municipally owned utilities such as San Antonio, and overrule the Commission=s single issue.[7]

Upon finding that the Commission had exceeded its statutory authority in conducting its TCOS proceeding, the district court Areversed and vacated@ the Commission=s order, which it found to be Avoid and invalid@ as exceeding the Commission=s authority. This is a suit for judicial review governed by section 2001.174 of the government code. That section authorizes the **trial court to reverse and remand if the agency=s findings, inferences, conclusions, or decisions exceeded its statutory authority.** *See* **Tex. Gov=t Code Ann. ' 2001.174(2)(B);** *Texas State Bd. of Pharmacy v. Seely***, 764 S.W.2d 806, 815 (Tex. App.C Austin 1988, writ denied) (holding that remand is proper judgment following**

___

[6] We note that even if a determination of a utility=s TCOS number were *conceptually* distinct, in some meaningful way, from setting its rates initially, there surely would be little or no *practical* distinction in situations where a utility attempts to charge a rate that would allow it to recover more than its predetermined TCOS. Such a rate would immediately be Adisputed@ by its transmission customers and the Commission could then step in to resolve this manufactured dispute by setting a rate.

[7] The Commission also attempts to argue that this very TCOS proceeding, where San Antonio=s costs were disputed by several intervening utilities, represents a dispute that it can resolve by setting reasonable rates. This circular argument has no merit, as such disputes only arose in the context of this invalid rate-setting procedure.

**reversal of agency order).  The court was not, in these circumstances, authorized to *vacate* the agency=s order.  *See BFI Waste Sys., Inc. v. Martinez Envtl. Group*, 93 S.W.3d 570, 581 (Tex. App.CAustin 2002, pet. filed).**

## CONCLUSION

The Commission was without authority to determine San Antonio=s TCOS  apart from a dispute which would entitle it to set rates.  Because the appropriate remedy in this case was reversal and remand to the Commission, we modify the judgment of the trial court to reverse the agency order and remand the case to the agency.  As modified, we affirm the trial-court judgment.


Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Yeakel

Modified and, as Modified, Affirmed

Filed:   April 24, 2003


**15**