TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00282-CV






City of Allen and Coalition of Cities, Appellant


v.


Public Utility Commission of Texas,;Oncor Electric Delivery Company; 

and Centerpoint Energy, Inc., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GV3-02966, HONORABLE MARGARET COOPER, JUDGE PRESIDING





O P I N I O N




 In this appeal, we must decide whether the Public Utility Commission has jurisdiction
under the Public Utilities Regulatory Act (PURA) to review certain ordinances that a city claims to
have enacted based on its police power. The City of Allen and a coalition of cities (1) appeal from a
district court judgment partially dismissing the Cities' appeal and partially affirming the
Commission's summary decision that invalidated four municipal ordinances because of their conflict
with Oncor Electric Delivery Company's (2) tariffs, PURA, and the Commission's rules. For the
reasons discussed below, we affirm the district court's order.

BACKGROUND


 In 1999, the legislature began dismantling Texas's electric utility regulation. (3) The
legislature revised PURA to allow determination of retail electric rates by competition. See City of
Corpus Christi v. Public Util. Comm'n, 51 S.W.3d 231, 235 (Tex. 2001). Oncor is a transmission
and distribution company created as part of TXU Electric Company's unbundling (4) during the
electricity deregulation process. Because electric transmission and distribution has not phased into
the competitive market, the Commission continues to govern Oncor, including analysis and approval
of Oncor's tariff. See Tex. Util. Code Ann. § 39.201 (West Supp. 2004-05); 16 Tex. Admin. Code
§ 25.214(c) (2004) (Public Util. Comm'n, Terms and Conditions of Retail Delivery Service Provided
by Investor Owned Transmission and Distribution Utilities). Oncor is certificated to distribute
electric service in Allen, Texas. 

 Allen is a home rule city under the Texas Constitution's home rule amendment. Tex.
Const. art. XI, § 5 (amended 1912). The home rule amendment altered the longstanding practice of
having special charters individually granted and amended by the legislature for the State's larger
cities. City of San Antonio v. City of Boerne, 111 S.W.3d 22, 26 & n.5 (Tex. 2003). Cities adopting
a home rule charter have the full power of self government and look to the legislature only for
limitations on their power. Id. Beginning in 2000, Allen enacted "zoning development standards"
in its land development code that required utilities to: (1) place certain electric distribution (5) lines
underground, (2) screen electric meters and other electric distribution facilities from view, and (3)
substitute metal or concrete distribution line poles for wooden poles--all at the utility's expense. (6) 
After enacting these ordinances, Allen denied two of Oncor's construction permits for failure to
comply with the electrical undergrounding specifications.

 Oncor challenged the ordinances in an appeal to the Commission. The Commission's
preliminary order stated that the Commission had jurisdiction to consider Oncor's appeal, and that
Allen exceeded its authority when it passed the ordinances in question. The Commission referred 
the matter to the State Office of Administrative Hearings (SOAH), (7) to analyze the applicability of
an analogous decision concerning the Commission's jurisdiction to review municipal ordinances that
required undergrounding utility lines and screening facilities. See Tex. Pub. Util. Comm'n,
Application of Texas Utilities Electric Company to Obtain a CCN for the Trophy Club-Coppell-Euless 138 kV Transmission Line; Appeals of Brazos Electric Power Cooperative, Inc., Tri-County
Electric Cooperative, Inc. and Texas Utilities Electric Company of an Ordinance of the Town of
Westlake, Texas; Appeals of Texas Utilities Electric Company and Brazos Electric Power
Cooperative, Inc. of an Ordinance of the Town of Trophy Club, Texas, Docket Nos. 6117, 6170-72;
1986 Tex. P.U.C. LEXIS 292, at *5.

 While the case was before SOAH, the Commission's staff moved for summary
decision, arguing that there were not any issues of material fact to be resolved at the evidentiary
hearing. In her proposal for decision, the administrative law judge recommended that the
Commission issue a summary decision for Oncor and invalidate the ordinances as a matter of law,
because the ordinances violated PURA and impaired the public interest by requiring that Oncor
install non-standard facilities at its own expense.

 After the administrative law judge released the proposal for decision--but before the
Commission issued its order--Allen repealed the portions of the ordinances that required
undergrounding lines and wooden pole replacement. (8) Applying exceptions to the mootness
doctrine, (9) the Commission invalidated the sections of Allen's ordinances that required
undergrounding, wooden pole replacement, and screening of facilities, to the extent that they
imposed the expense of installing non-standard electric distribution facilities on Oncor, in violation
of its tariff, PURA, and Commission rules.

 On administrative appeal, the district court ruled that it lacked jurisdiction to consider
the Cities' moot challenge to the Commission order invalidating the undergrounding and pole
replacement provisions of the ordinances. The court partially dismissed the Cities' appeal and ruled
that the remainder of the Cities' challenges lacked merit. (10) 

 In a single point of error, the Cities challenge the Commission's appellate jurisdiction
over the ordinances in Allen's land development code. They contend that Allen's ordinances were
not promulgated to regulate Oncor, but to protect the health, safety, and welfare of Allen's citizens,
that is, as an exercise of police power. The Cities ask this Court to "vacate the Commission order
and reverse the district court's order as to its finding of Commission jurisdiction."


ANALYSIS


Motion to Dismiss

 The Utilities and the Commission moved to dismiss this appeal, asserting that we
cannot reach the question of the Commission's jurisdiction over the undergrounding and pole
replacement provisions in the ordinances without addressing the district court's refusal to rule on
them, and that the Cities waived this point of error due to inadequate briefing. 

 However, the question of jurisdiction is fundamental and can be raised at any time
in the trial of a case or on appeal. Public Util. Comm'n v. J.M. Huber Corp., 650 S.W.2d 951, 955
(Tex. App.--Austin 1983, writ ref'd n.r.e.). Administrative agencies may exercise only those
powers the law confers upon them in clear and express statutory language and those reasonably
necessary to fulfill a function or perform a duty that the legislature has expressly placed with the
agency. In re Entergy Corp., 142 S.W.3d 316, 322 (Tex. 2004). 

 We liberally construe the points of error in order to obtain a just, fair and equitable
adjudication of the rights of the litigants. Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982). We
look not only at the wording of the points of error, but also at the argument under each point to best
determine the intent of the party. Id. Read fairly, the Cities' brief complains about the district
court's failure to vacate (11) the Commission's order--after the court determined that the Cities'
challenges to the repealed provisions were moot--because it allowed the Commission's ruling,
which invalidated parts of the ordinances, to stand. The Cities also ask that "the district court's order
be reversed as to its finding of Commission jurisdiction" over the screening portions of the
ordinances. The district court's judgment did not alter the effect of the Commission's order and the
Cities have not waived the issue of whether the Commission lacked jurisdiction to review Allen's
four ordinances. Accordingly, we deny the motion to dismiss.


Scope and Standard of Review

 The district court affirmed the Commission's order concerning the non-repealed
screening requirements (". . . in all other respects [the court] renders judgment that the Commission's
order in Docket No. 25429 is affirmed, and that plaintiffs take nothing"). The court did not rule on
whether the Commission had appellate jurisdiction over the repealed provisions in Allen's
ordinances; it dismissed that part of the Cities' appeal as moot ("Accordingly it is ORDERED,
ADJUDGED, and DECREED that the Cities' appeal is dismissed as to those portions of the
Commission's Order in Docket No. 25429 concerning the ordinances repealed by City of Allen
ordinance No. 2137-1-03 . . . ."). The court's refusal to rule on the repealed provisions of the
ordinances (undergrounding and pole replacement) does not constitute a finding that the Commission
lacked jurisdiction to review these provisions. Accordingly, we will address the issue of the
Commission's appellate jurisdiction over the repealed and non-repealed portions of the municipal
ordinances. The Commission's appellate jurisdiction over Allen's ordinances is a question of law
that we review de novo. See Public Util. Comm'n v. City Pub. Serv. Bd., 109 S.W.3d 130, 135 (Tex.
App.--Austin 2003, no pet.).


Allen's Ordinances

 Oncor sought construction permits for two new projects designed to meet peak energy
demands during the summer of 2002. The proposed projects called for installation of an overhead
distribution line located within Oncor-owned easements, Allen's rights-of-way, and state rights-of-way. Oncor's projects were not associated with any particular development project. Allen denied
Oncor's permits, based on the undergrounding requirements in its land development code.

 The Cities appeal the Commission's jurisdiction to review four ordinances in Allen's 
land development code. The first ordinance, passed June 15, 2000, stated:


1. All utilities, including, but not limited to, electrical, gas, and telephone shall be
placed underground, except that electrical transmission and main feeder lines
(12.5 or more Kilovolts) may be located overhead. 


2. Utility meters and other utility apparatus, including, but not limited to
transformers, shall be located to the rear of the structure unless adequately
screened from view of public streets and adjoining properties. Adequately
screened from view shall include screening, as well as the utilization of
landscaping and other site elements.


3. All required screening shall meet clearances required by affected utility
companies. Wall-mounted equipment, including meters (such as banks of
electric meters on the rear or side wall of multi-tenant buildings), shall be
screened from public streets by one of the following methods.


 a. Landscaping, including trees or evergreen shrubbery.


 b. Masonry walls in conjunction with landscaping.


 c. Wall-mounted screening devices, such as cabinets or partitions which are
architecturally compatible with the facade.



Allen, Tex., Land Development Code, art. VII, §§ 7.03.5, 7.07.3, 8.10.3c (2000).


 The second ordinance, passed May 3, 2001, left the screening provisions unchanged,
but expanded the scope of the utilities included in the undergrounding provision, and added a new
subsection that required the utility to pay for the undergrounding: 


1. All utilities, existing and proposed, adjacent to and within new development,
including, but not limited to, electrical, gas, television and
telephone/telecommunication shall be placed underground, except that electrical
transmission [(]59 or more Kilovolts) may be located overhead, providing that
this requirement does not conflict with existing utility service regulations. 


2. New development shall assume responsibility for all expense related to the
underground placement of utilities. . . . 



Id. §§ 7.03.5, 7.07.3, 8.10.3c (2001).

 The third ordinance, passed September 6, 2001, made only one change, limiting the
undergrounding provision to new utility installations: 


1. All new utilities, including, but not limited to, electrical, gas, television and
telephone/telecommunication shall be placed underground, except that electrical
transmission 59 or more Kilovolts may be located overhead, providing that this
requirement does not conflict with existing utility service regulations.



Id. §§ 7.03.5, 7.07.3, 8.10.3c (2001).

 The fourth ordinance, passed January 17, 2002, left the screening provisions mostly
unchanged, but added several new sections, including one requiring replacement of wooden poles
with metal or concrete poles at the utility's (service provider's) expense: 


1. All new residential utility installations, including, but not limited to, electrical,
gas, television and telephone/telecommunication shall be placed underground.


2. All new non-residential utility installations, including but not limited to,
electrical, gas, television and telephone/telecommunication shall be placed
underground where service is provided adjacent to public street or right-of-way. 
Where electrical service is provided from an alley or rear easement not located
adjacent to a public street, primary electrical service may be provided overhead
along the property line. Primary and secondary service routed on the site shall
be placed underground.


3. All new construction within the public street rights-of-way shall be located
underground. Where a street is scheduled for reconstruction, new development
may be required to provide an escrow of the difference between overhead and
underground service.


4. Nothing herein shall prevent temporary service during construction from being
located overhead.


5. New development shall assume responsibility for all expense related to the
underground placement of utilities. 


6. Any upgrade or reinforcement of facilities with existing overhead service by the
service provider shall require replacement of wooden poles with metal or
concrete poles at the expense of the service provider. An "upgrade" for
purposes of this section, shall mean any change that requires the installation, re-installation or addition of a new pole. In-line poles necessary for service drops
will be reviewed by the City Engineer, and may be approved on a case-by-case
basis.


7. Any upgrade or reinforcement of facilities with underground service by the
service provider shall be placed underground at the expense of the service
provider.


8. Utility meters and other utility apparatus, including, but not limited to
transformers and switch boxes, shall be located to the rear of the structure unless
adequately screened from view from public streets and adjoining properties and
shall be suitable for access required for service and maintenance. Adequately
screened from view shall include screening walls, as well as the utilization of
landscaping and other site elements.


9. All required screening shall meet clearances required by affected utility
companies and shall be suitable for access required for service and maintenance. 
Wall-mounted equipment, including meters (such as banks of electric meters on
the rear or side wall of multi-tenant buildings), shall be screened from public
streets by one of the following methods.


 a. Landscaping, including trees or evergreen shrubbery.


 b. Masonry walls in conjunction with landscaping.


 c. Wall-mounted screening devices, such as cabinets or partitions which are
architecturally compatible with the facade. 


10. Electrical transmission [(]59 or more Kilovolts) may be located overhead.



Id. §§ 7.03.5, 7.07.3, 8.10.4 (2002).


Allen's Ordinances as Exercises of Authority over Rights-of-Way or Utility Regulation

 The Cities contend that Allen's zoning development standards were not promulgated
to regulate Oncor, but to protect the health, safety, and welfare of Allen's citizens, that is, as an
exercise of police power. They defend Allen's ordinances as conditions on Oncor's use of city streets
and rights-of-way:


A home rule municipality has the following powers: (1) To prohibit the use of any
street . . . of the city by any telegraph, telephone, electric light . . . gas company, or
any other character of public utility without first obtaining the consent of the
governing authorities expressed by ordinance and upon paying such compensation
as may be prescribed and upon such condition as may be provided by any such
ordinance.



Tex. Rev. Civ. Stat. Ann. art. 1175, § 1 (West Supp. 2004-05).

 The Cities acknowledge that an electric utility has the right to "construct, maintain,
and operate lines over, under, across, on, or along a state highway, a county road, a municipal street
or alley, or other public property in a municipality," but emphasize that the utility may exercise that
authority "with the consent of and subject to the direction of the governing body of the
municipality." See Tex. Util. Code Ann. §§ 181.042-.043 (West 1998). Thus, the Cities argue that
municipalities may designate the location of utility facilities that are to be placed in its rights-of-way (12) and the screening of those facilities, so long as these ordinances are not unreasonable or
arbitrary, and do not violate the constitution and laws of the state. See Dykes v. City of Houston, 406
S.W.2d 176, 181 (Tex. 1966). Additionally, the Cities claim that Allen's zoning ordinances enjoy
a presumption of validity; courts cannot interfere unless it appears that:


the ordinance represents a clear abuse of municipal discretion, and the
"extraordinary" burden rests on one attacking the ordinance to show that no
conclusive, or even controversial or issuable fact or condition existed which would
authorize the governing board of the municipality to exercise the discretion confided
to it in the passage of that part of the zoning ordinance under attack.



City of Bellaire v. Lampkin, 317 S.W.2d 43, 45 (Tex. 1958).

 Nevertheless, the Utilities and the Commission assert that the Cities rely on
authorities that pre-dated PURA, and that the ordinances were an exercise of Allen's original
jurisdiction over Oncor's rates, operations and services:


To provide fair, just, and reasonable rates and adequate and efficient services, the
governing body of a municipality has exclusive original jurisdiction over the rates,
operations, and services of an electric utility in areas in the municipality, subject to
the limitations imposed by this title [PURA].



Tex. Util. Code Ann. § 33.001(West 1998). The Utilities and the Commission also assert that
Allen's regulatory authority cannot exceed that of the Commission, and Allen may not regulate in
a manner different from the Commission. See Tex. Util. Code Ann. § 33.004(b) (West 1998).

 Because Allen denies that its zoning development standards were an exercise of its
"exclusive original jurisdiction over the rates, operations, [or] services of an electric utility," it
disputes the applicability of the statute authorizing the Commission's appellate jurisdiction. Tex.
Util. Code Ann. § 32.001(b) (West 1998) ("The commission has exclusive appellate jurisdiction to
review an order or ordinance of a municipality exercising exclusive original jurisdiction under this
subtitle.")

 To determine whether Allen exercised its exclusive original jurisdiction over Oncor's
"rates, operations, and services" by promulgating these ordinances, we examine the definitions of
these terms.


The Ordinances Regulate Oncor's "Rates" as Defined by Oncor's Tariff 

 A utility's rates are set forth in its tariff, which contains all charges stated separately
by type of service, the rules and regulations of the utility, and any contracts that affect rates, charges,
terms or conditions of service. See 16 Tex. Admin. Code § 25.5 (131) (2004) (Public Util. Comm'n,
Definitions). Oncor was required to adopt a tariff and obtain the Commission's approval of it. See
id. § 25.241 (West 2002); Tex. Util. Code Ann. § 39.201 (West Supp. 2004-05). The tariff had to
include terms from a Commission-approved, pro forma tariff. See id. § 25.214 (c)-(d) (West 2002).

 Allen's ordinances conflict with the provisions in Oncor's tariff that require customer
payment for installation of non-standard electrical distribution facilities: (13)


Company is responsible for the construction, extension, upgrade, or alteration of
Delivery System Facilities necessary to connect Retail Customer's Point of Delivery
to Company's Delivery System in conjunction with Section 5.7 FACILITIES
EXTENSION POLICY and the terms and conditions contained herein. Company
makes extension of Delivery System Facilities to Retail Customer's electrical
installation so as to minimize the cost of such extension. Extension is normally made
at no cost to Retail Customer except in those instances where the cost of the
requested extension of Company's facilities is in excess of the standard allowances
stated herein, or where the installation of non-standard facilities is requested. In
these instances, a contribution in aid of construction ("CIAC") is required from
Retail Customer for all extensions where the estimated cost of the extension is in
excess of the standard allowances.



Oncor's Tariff for Retail Delivery Services § 6.1.2.2.1 (emphasis added).

 The tariff defines "standard distribution facilities" as those necessary to transport
electric power:


Company's standard distribution facilities consist of the Delivery System facilities
necessary to transport electric power and energy from a single, single-phase or three
phase distribution source to Retail Customer at one Point of Delivery, with one
standard Company Meter, at one of Company's available standard voltages.



Id. § 6.1.2.2.1.1 (emphasis added). Conversely, "non-standard facilities" are those exceeding what
is normally required for service:


Non-standard facilities include but are not limited to a two-way feed, automatic and
manual transfer switches, service through more than one point of delivery, redundant
facilities, facilities in excess of those normally required for service, or facilities
necessary to provide service at a non-standard voltage. If Retail Customer desires
Delivery Service utilizing non-standard facilities, as described above, and not
covered elsewhere in these Service Regulations, then Company may construct such
facilities pursuant to Section 5.7.5, NON-STANDARD FACILITIES and Section
6.1.2.2.6, NON-STANDARD FACILITY EXTENSIONS.



Id. § 6.1.2.2.2 (emphasis added).

 Undergrounding distribution lines, replacing wooden poles with metal or concrete
poles, and screening facilities with landscaping, walls, or cabinets does not "minimize the cost of
facility extension" as required by Oncor's tariff. An Oncor electrical engineer, John C. Soward,
testified that installation of an underground feeder circuit in Allen's project is twice as expensive as
overhead construction--a difference of about $1.1 million. (14) He further testified that the cost of
using metal or concrete poles is about three times that of an equivalent feeder with wooden poles. (15) 
He also stated that screening facilities by use of landscaping, masonry walls, or mounted cabinets
introduces another set of unplanned costs.

 Furthermore, the ordinances' specifications are unnecessary "to transport electric
power" as referenced in the tariff. Nothing in the Commission's rules concerning electrical service
reliability and continuity requires underground installation of distribution lines. See 16 Tex. Admin.
Code § 25.52 (2004) (Public Util. Comm'n, Reliability and Continuity of Service).

 In fact, one concern of the Utilities and the Commission about undergrounding
distribution lines is the adverse affect it may have on continuity of electrical service. Soward
testified that special equipment is required to locate underground lines, and that buried lines lengthen
repair time. He also remarked that underground systems must be built with greater precision, to
avoid damage or contact with other underground utilities, and greater redundancy, to achieve
acceptable levels of reliability performance and to compensate for greater fault location and repair
times. Soward stated that repair times are only prolonged by hiding facilities from view.

 Because electrical service may be delivered by overhead lines at minimum cost, while
underground systems require specialized equipment, greater redundancy, and higher expense, 
underground facilities are "in excess of those normally required for service" as specified by the tariff
and thus, are "non-standard." Similarly, utility construction that includes metal or concrete poles
and facility-concealing landscaping, walls, or cabinets exceeds what is "necessary to transport
electric power" and does not "minimize the cost of extension." Such installations are also "non-standard."

 Design considerations sometimes require the use of non-standard facilities. Soward
testified that underground feeders are used in congested areas where overhead lines would not be
technically or economically feasible--such as downtown Dallas and Fort Worth--and in locations
adjacent to large substations. He also stated that Oncor uses concrete and steel poles when the
stresses on wooden poles would be excessive, for example, around sharp street curves or for
abnormally lengthy line spans. He observed that parts of Allen's project already have underground
lines or concrete and steel poles as a result of such electrical design considerations. 

 But if Allen requests non-standard facilities--for reasons unrelated to design
necessity (16)--the tariff requires that Allen is responsible for the increased cost:


If Retail Customer desires Delivery System service which involves non-standard
facilities as described in Section 6.1.2.2.1.2 of this Tariff, in addition to the cost in
excess of the standard allowance in described in Section 6.1.2.2.5.3 for construction
of standard facilities, if any, Retail Customer pays Company prior to Company's
construction of non-standard facilities the total estimated cost of all non-standard
facilities to meet Retail Customer's request. Company may terminate the provision
of any Delivery Service utilizing non-standard facilities at the end of the contract
term, or in the absence of a contract term, on reasonable notice to Retail Customer's
Competitive Retailer. 



Oncor's Tariff for Retail Delivery Services § 6.1.2.2.6. The Commission's pro forma tariff, section
5.75, echoes this principle:


If the entity requesting Construction Service desires Delivery Service utilizing non-standard Delivery System facilities . . . Company shall construct such facilities
unless, in the reasonable judgment of Company, such construction would impair
Company's facilities or facilities with which Company is interconnected, impair the
proper operation of such facilities, impair service to retail customers, or there are
other appropriate concerns that the entity requesting service is unable or unwilling
to correct. The entity requesting Construction Service shall pay to Company the
estimated cost of all non-standard facilities, offset by any applicable allowance.


See 16 Tex. Admin. Code § 25.214(d). Similar provisions appear in Centerpoint Energy, Inc.'s
tariff. 

 Overhead distribution facilities are Oncor's standard extension of service to a
customer, according to one Oncor senior electrical engineer, Rudy D. Garza, because overhead
facilities provide service at the lowest reasonable cost, in accordance with Oncor's tariff, section
6.1.2.2.1. Garza testified that placing facilities underground is considered non-standard installation
for which an up-front contribution in aid of construction is required, per section 6.1.2.2.6. He
observed that


it is important to provide for equitable treatment among all customers throughout
Oncor's service area. By defining overhead service as standard, Oncor prevents a
customer in one area of the system with overhead facilities, from helping to pay for
the underground installation in other areas of the system. The goal is to require those
who cause the Company to incur unnecessary costs to pay for those costs, rather than
pass them on to the entire customer base in the future. Basic cost causation
principles call for this methodology so that subsidization between customer classes
is minimized.



 To recoup the additional expense imposed by Allen's ordinances, Oncor would have
to shift the extra cost to its customers in the next rate case. Meanwhile, Oncor would bear all costs
that were not contemplated when its tariff rates were set. When the new rate takes effect, all
customers in Oncor's service area will have to pay the price of compliance with the ordinances, but
only Allen's citizens will realize any benefit for the extra charge.

 Although the Cities propose that Oncor collect the ordinances' extra costs through
rate increases restricted to Allen's residents ("geographic ratemaking"), the ordinances still regulate
electric utility rates by altering the terms of Oncor's tariff. (17) Moreover, the Texas Supreme Court
recognized "the contemporary reality that the assets of an integrated utility simultaneously serve all
its customers rendering the allocation of cost on a territorial basis an inappropriate method of rate-setting in the context of present-day technology." City of Corpus Christi v. Public Util. Comm'n,
572 S.W.2d 290, 296 (Tex. 1978). Because Allen's ordinances obliterate the portion of the tariff that
held Allen financially responsible for the non-standard distribution facilities that were installed at
its request, Allen is regulating Oncor's tariff rates, and the Commission has jurisdiction to review
the ordinances.


The Ordinances Regulate Oncor's "Rates," "Operations" and "Services" as Defined by PURA 

 The Commission has appellate jurisdiction over Allen's ordinances because they
regulate Oncor's rates, operations, and services, as those terms are defined by PURA. According
to PURA, a "rate" 


includes a compensation, tariff, charge, fare, toll, rental, or classification that is
directly or indirectly demanded, observed, charged, or collected by an electric utility
for a service, product, or commodity described in the definition of electric utility in
this section and a rule, practice, or contract affecting the compensation, tariff, charge,
fare, toll, rental, or classification that must be approved by a regulatory authority.



Tex. Util. Code Ann. § 31.002(15) (West Supp. 2004-05). 

 Allen's ordinances regulate the compensation that Oncor would typically collect from
Allen for non-standard facilities by reducing Oncor's receivable amount to zero. Oncor would
otherwise receive prepayment of the "total estimated cost of all non-standard facilities." The
ordinances also regulate rates because they change the terms of Oncor's tariff--mandating non-standard distribution facilities, free of charge to Allen--without the Commission's approval. 

 PURA also defines "service," which


has its broadest and most inclusive meaning. The term includes any act performed,
anything supplied, and any facilities used or supplied by a public utility in the
performance of the utility's duties under this title to its patrons, employees, other
public utilities, an electric cooperative, and the public. The term also includes the
interchange of facilities between two or more public utilities. The term does not
include the printing, distribution, or sale of advertising in a telephone directory.



Id. § 11.003(19) (West Supp. 2004-05). By directing line placement, pole type, and screening of
electric facilities (such as meters), Allen's ordinances regulate Oncor's work performance and
materials. Thus, Allen's ordinances regulate Oncor's service to its customers.

 While PURA does not define "operations," it has been observed that "[t]he
jurisdiction of the commission extends not only to rates . . .but to every aspect of an electric utility's
operation." Robert A. Webb, The 1975 Texas Public Utility Regulatory Act: Revolution or
Reaffirmation?, 13 Hous. L. Rev. 1, 14 (1975). Ordinances such as Allen's--which direct the
location of electric facility installation, specify the devices used for utility pole upgrades, and carve
payment exemptions out of the tariff--control Oncor's work and constitute exercises of municipal
jurisdiction over a utility's operations. By PURA's definition, the Commission has appellate
jurisdiction to review these types of municipal ordinances.


Allen's Ordinances Conflict with PURA's Comprehensive Regulatory Scheme 

 Another basis for the Commission's jurisdiction is that the ordinances' utility
regulations conflict with PURA's comprehensive regulatory scheme. Prior to PURA's enactment
in 1975, each individual city could regulate the utilities within its boundaries. PURA altered that
piecemeal oversight by providing a comprehensive regulatory system for utilities. Tex. Util. Code
§ 11.002(a) (West Supp. 2004-05) ("The purpose of this title [PURA] is to establish a
comprehensive and adequate regulatory system for public utilities to assure rates, operations, and
services that are just and reasonable to the consumers and to the utilities."). Empowering the
Commission with jurisdiction to review certain municipal orders furthers the goal of regulatory
uniformity. Dan Pleitz, et al., Municipalities and the Public Utility Regulatory Act, 28 Baylor L.
Rev. 977, 978 (1976).

 A recent ruling from the Texas Supreme Court illustrates PURA's broad scope. See
In re Entergy, 142 S.W.3d at 323. In re Entergy concerned a dispute over settlement proceeds from
a utility merger. Id. at 319. Two corporate utilities agreed that savings realized from their merger
would be incorporated into three post-merger rate proceedings before the Commission, to benefit
their customers. Id. The agreement was placed in a Commission order. Id. With the advent of
deregulation, and while the second rate case was pending, the Commission staff and the corporations
entered into a settlement that postponed retail competition in their service area. Id. at 320. A group
of ratepayers sued the corporations for breach of contract in district court. Id. The corporations
moved to dismiss, asserting that the district court lacked jurisdiction over the suit because of the
Commission's exclusive jurisdiction under PURA. Id. at 321-22. The ratepayers responded that
they were not directly challenging a Commission order and that the Commission lacked jurisdiction
to settle a dispute over a private contract. Id. at 323. Finding that the Commission had exclusive
jurisdiction, the court stated:


[T]he statutory definition of PURA as "comprehensive" demonstrates the
Legislature's belief that PURA would comprehend all or virtually all pertinent
considerations involving electric utilities operating in Texas. That is, PURA is
intended to serve as a "pervasive regulatory scheme" of the kind contemplated in
David McDavid Nissan.



Id. (citing Subaru v. David McDavid Nissan, Inc. 84 S.W.3d 212, 221 (Tex. 2002)).

 The Cities argue that the Commission's authority did not allow it to impair Allen's
home rule and police power authority by voiding Allen's zoning development standards. The Cities
generally cite this Court's decision in Sexton v. Mount Olivet Cemetery Association to support the
proposition that the Commission may not assert a new and additional power, regardless of whether 
the new power is viewed as being expedient for administrative purposes. See Sexton, 720 S.W.2d
129, 137-38 (Tex. App.--Austin 1986, writ ref'd n.r.e.).

 But the Commission's appellate review of ordinances that regulate an electric utility's
rates, operations, and services, is not a "new" or "additional" power--it is an enumerated power in
section 32.001(b) of the utility code. See Tex. Util. Code Ann. § 32.001(b) (West 1998). 
Significantly, the Cities omit the language immediately preceding their cited excerpt, which states
that an agency generally has all power necessary to fulfill its specifically delegated duties:


It is axiomatic that such agencies are creatures of statute and have no inherent
authority. They may, therefore, exercise only those specific powers conferred upon
them by law in clear and express language, and no additional authority will be
implied by judicial construction. However, with respect to a power specifically
granted the agency, the full extent of that power must be ascertained with due regard
for the rule that the Legislature generally intends that an agency should have by
implication such authority as may be necessary to carry out the specific power
delegated, in order that the statutory purpose might be achieved. Moreover, the
Legislature impliedly intends, as a general rule, that an agency should have whatever
power is necessary to fulfill a function or perform a duty placed expressly in the
agency by the Legislature. The Legislature does not intend that agency functions be
an exercise in futility.



Sexton, 720 S.W.2d at 137. Allen's power to legislate for its own benefit is limited by the
Commission's regulatory authority under PURA, which is itself an exercise of police power in the
interest of all Texas citizens. See City of Corpus Christi, 51 S.W.3d at 241 & n.33 ("The United
States Supreme Court has said that 'the regulation of utilities is one of the most important of the
functions traditionally associated with the police power of the States.'") (quoting Arkansas Elec.
Coop. Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377 (1983); Munn v. Illinois, 94
U.S.113, 125 (1877)).

 One commentator has concluded that there is no power in the municipality to
supervise and regulate utilities where the purpose of the state law creating the commission is to
establish a complete and uniform system throughout the state for the supervision and regulation of
public utility rates and service. See 12 Eugene McQuillin, Municipal Corporations § 34.146 (3d ed.
1995). A municipality may, under its police power, prescribe reasonable regulations as a protection
to the health, life, and safety of its inhabitants, even as applied to public service corporations, but
these regulations are incident to the state's sovereign police power, and must be so restricted. Id.
(emphasis added). Under the guise of a police regulation the municipality cannot undertake to
prescribe service, rates, or charges containing inequalities, unjust discriminations, undue preference
or advantages, contrary to the state law and free from state investigation or regulation by the state
commission. Id. Allen's ordinances cannot be reconciled with PURA's comprehensive regulatory
function.

 Other states have found their utility commission's jurisdiction broad enough to
address the reasonableness and equity issues that arise when a municipality makes a policy decision
to require underground relocation of utilities. See, e.g., Homer Elec. Ass'n, Inc. v. City of Kenai, 816
P.2d 182, 187 (Alaska 1991) (commission had jurisdiction to decide reasonableness of conditions
imposed on utilities' permit to use municipal rights-of-way; commission previously found it was
unreasonable for city to direct unreimbursed relocations of utilities laid in municipal rights-of-way);
City of Anaheim v. Pacific Bell Tel. Co., 14 Cal. Rptr. 3d 725, 729-30 (Cal. Ct. App. 4th Dist. 2004),
pet. denied, 2004 Cal. LEXIS 9685 (Cal. Oct. 13, 2004) (commission had exclusive jurisdiction to
decide whether city's undergrounding ordinance interfered with commission's utility regulation, and
to address the equitable statewide issue about the order in which communities throughout California
should have their overhead facilities moved underground); Glen View Dev. Co. v. Public Serv. Elec.
& Gas Co., 271 A.2d 903, 904 (N.J. 1970) (commission had jurisdiction to decide who pays for cost
of undergrounding utilities when an ordinance mandates such relocation; state statutes requiring
municipal consent for use of its streets by utilities did not authorize local government to legislate
upon subject of who should be responsible for payment).

 Courts that have ruled in favor of the municipalities had distinct legal grounds for
upholding the ordinances. For example, a Minnesota court affirmed a municipal ordinance
mandating underground utility lines based on a Minnesota statute that specifically authorized cities
to direct utility line placement. See Northern States Power Co. v. City of Oakdale, 588 N.W.2d 534,
538-39 (Minn. Ct. App. 1998). No such statute exists in Texas to support Allen's ordinances. In
Colorado, a court found that a municipal ordinance's conflict with a utility's tariff would not prevent
a city from requiring the utilities to place lines underground, since the tariff did not rise to the level
of a statute. See U. S. W. Communications, Inc. v. Longmont, 948 P.2d 509, 517 (Colo. 1997). In
this case, Allen's ordinances conflict with PURA, as well as Oncor's tariff. See, e.g., Tex. Util.
Code Ann. § 33.004(b) (West 1998). 

 Although these out-of-state cases parallel certain concerns in this appeal, the
Commission's decision in Trophy Club bears the strongest resemblance to the present jurisdictional
question. See 1986 Tex. P.U.C. LEXIS 292, at *21, *64, *67.


Commission had Appellate Jurisdiction over Similar Ordinances in Trophy Club

 In Trophy Club, the Commission found it had jurisdiction over ordinances similar to
the four at issue. See id. The Texas Utilities Electric Company sought Commission approval to
rebuild, aboveground, a distribution feeder line that ran through the towns of Trophy Club and
Westlake. Id. at *14. Trophy Club wanted the utility line placed underground, but declined to pay
for the cost difference between underground and overhead construction, based on this ordinance:


After the effective date of this ordinance, no electric or communication utility,
whether privately or publicly owned, shall install or reconstruct, or cause to be
installed or reconstructed, any overhead electric or communication transmission or
distribution facility within the corporate limits of the Town of Trophy Club unless
a showing is made before the Town Council and a finding made by the Town Council
that undergrounding such facility would not be feasible or would be inconsistent with
sound environmental planning.



Id. at *20-21, 28. However, Texas Utilities' tariff specified that 


[u]nderground service is provided to a Customer who meets Company requirements
set out herein and pays to Company an amount based on the cost difference between
overhead and underground service as estimated by Company.



Id. at *27-28. On administrative appeal, Trophy Club argued that the Commission lacked
jurisdiction because the ordinance was enacted in accordance with the municipality's police power,
while the Texas Utilities Electric Company and Brazos Electric Power Cooperative, Inc. asserted that
PURA authorized the Commission's appellate review. Id. at *19-20. 

 Agreeing with the electricity providers, the hearing examiner asked to the
Commission to consider 


how very unlikely it is that the Legislature would create this agency to administer a
"comprehensive regulatory system" over "utility rates, operations, and services," 
PURA section 2, but deny it the authority to review municipal ordinances such as
these, which drastically affect such operations and services. The examiner cannot
believe that the Legislature intended substantive municipal regulation of utility
services and operations to be unfettered by Commission appellate review. 



Id. at *24. He invited the Commission to reflect upon the consequences, if municipalities had the
authority to issue ordinances such as these:


If utilities were not notified of the ordinances or for some other reason failed to
appeal to the Commission, the "comprehensive regulatory system" of PURA Section
2 would be transformed into a patchwork of conflicting state and municipal
regulations and requirements. Utilities' ability to construct facilities and to provide
continuous and adequate service would depend upon the judgment of local officials
rather than that of the Commission. That result is not what the Legislature intended
when it vested jurisdiction over public utilities in this agency.



Id. at *33. The examiner also cited the Commission's 1981 order in Magic Valley Electric
Cooperative, which rejected the theory that ordinances passed pursuant to a city's police powers are
beyond the Commission's appellate jurisdiction. Id. at *21 (citing Petition of Magic Valley Electric
Cooperative, Inc. and Central Power and Light Company for Review of an Ordinance Passed by
City of Brownsville, Docket Nos. 2864, 2882; 1981 Tex. P.U.C. LEXIS 332, at *17) (invalidating
a Brownsville ordinance that conflicted with a Commission rule and PURA by requiring public
utilities to file maps with the city, at least seven days before beginning construction, showing the
location of proposed utility facilities)). The examiner concluded that the Commission had
jurisdiction, under PURA, to consider the appeal of Trophy Club's ordinance.

 The Commission adopted the examiner's report, finding that the Trophy Club
ordinance affected the operations and services rendered by electric companies within municipal
limits, regardless of whether the ordinance was enacted pursuant to the town's police powers. Thus, 
the Commission had jurisdiction to hear an appeal of the Trophy Club ordinance. Id. at *21, *67-68. 
 As in Trophy Club, the Commission had appellate jurisdiction in this case based on
the ordinances' conflict between municipal and state utility regulations. The Cities have not shown 
that Oncor may comply with its tariff, PURA, and Commission rules without simultaneously
violating the ordinances in Allen's land development code.


CONCLUSION


 The Cities' sole point of error challenges the Commission's jurisdiction to review 
ordinances in Allen's land development code that Allen claims to have enacted based on its police
power. We find that the Commission had appellate jurisdiction to review Allen's ordinances under
section 32.001(b). See Tex. Util. Code Ann. § 32.001(b) (West 1998). Requiring Oncor to place
utility distribution lines underground, replace wooden poles with metal or concrete poles, and screen
utility facilities--without charging Allen--constitutes municipal regulation of Oncor's "rates,"
"operations," and "services," within the definitions of the Public Utilities Regulatory Act. 
Accordingly, we affirm the district court's judgment.



 

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: March 17, 2005

1. The coalition members are the cities of Addision, Austin, Bedford, Colleyville, Denton, 
El Paso, Farmers Branch, Grapevine, Hurst, Keller, Missouri City, North Richland Hills, Pasadena,
Tyler, Westlake, West University Place, and Wharton. We will refer to the coalition and Allen
collectively as "Cities." 
2. Oncor Electric Delivery Company is now known as TXU Electric Delivery Company. 
Oncor and Centerpoint Energy, Inc. will be referred to collectively as the "Utilities."
3. The legislature found that the production and sale of electricity was not a monopoly
warranting regulation of rates, operations, and services and that the public interest in competitive
electric markets required that, except for transmission and distribution services and for the recovery
of stranded costs, electric services and their prices should be determined by customer choices and
the normal forces of competition. The legislature enacted [PURA] to protect the public interest
during the transition and establishment of a fully competitive electric power industry. Tex. Util.
Code § 39.001(a) (West Supp. 2004-05).
4. "Unbundling" required each electric utility to separate its business activities from one
another into the following units: (1) a power generation company, (2) a retail electric provider, and 
(3) a transmission and distribution utility. Tex. Util. Code § 39.051(b) (West Supp. 2004-05).
5. A "distribution" line is a power line operated below 60,000 volts, when measured
phase-to-phase. See 16 Tex. Admin. Code § 25.5 (31) (2004) (Public Util. Comm'n, Definitions). 
6. Developers are responsible for the cost of extending utility services with underground
installation to new subdivisions. See Allen, Tex., Land Development Code, art. VII, §§ 7.03.5.5,
7.07.3e, 8.10.4e (2002). No developer was associated with Oncor's projects.
7. The coalition of cities and Centerpoint Energy, Inc. intervened in the case while it was
before the State Office of Administrative Hearings.
8. The portions of the ordinances requiring screening of utility facilities were not repealed.
9. The Commission found two types of mootness exceptions applicable: the "capable of
repetition, yet evading review" and "public interest" exceptions. First, it noted that Allen could
repeat its actions and evade a ruling by reenacting ordinances like the ones at issue, waiting for the
proposal for decision--and if it is unfavorable to them--repealing the ordinances before the
Commission issues its order. Second, the Commission determined that addressing the ordinances'
invalidity served the public interest by preventing other cities from adopting similar ordinances, and
precluding negative impacts to the electric utilities' transmission system and market competition. 
10. The district court's final judgment, in relevant part, states: 


The Court finds that the Court has no jurisdiction to consider the Cities'
challenges to the Commission's order invalidating parts of the ordinances of the
City of Allen that were repealed by City of Allen Ordinance No. 2137-1-03
because Cities' appeal to this Court is moot and no exception to the mootness
doctrine applies, and that the remainder of Cities' challenges are without merit. 


Accordingly it is ORDERED, ADJUDGED, and DECREED that the Cities'
appeal is dismissed as to those portions of the Commission's Order in Docket
No. 25429 concerning the ordinances repealed by City of Allen ordinance No.
2137-1-03, and in all other respects renders judgment that the Commission's
order in Docket No. 25429 is affirmed, and that plaintiffs take nothing. 
11. We note that the district court lacked power to vacate the Commission's order. The Cities'
brief acknowledges that section 2001.174 of the government code applied to their suit for judicial
review. Tex. Gov't Code Ann. § 2001.174 (West 2000). That section authorizes the reviewing court
to reverse or remand--but not vacate--an agency decision if the agency's findings, inferences,
conclusions, or decisions exceeded its statutory authority. See Public Util. Comm'n v. City Pub.
Serv. Bd., 109 S.W.3d 130, 137-38 (Tex. App.--Austin 2003, no pet.) (district court erred in
vacating void Commission order); BFI Waste Sys., Inc. v. Martinez Envtl. Group, 93 S.W.3d 570,
581 (Tex. App.--Austin 2002, pet. denied) (district court lacked authority to vacate Commission's
order; appellate court construed judgment as reversal of Commission's order); see also Tex. Gov't
Code Ann. § 2001.174(2)(B) (West 2000) (court reviewing a state agency's decision in a contested
case may either affirm, reverse, or remand case to agency for further proceedings). Thus, the Cities'
complaint that the district court "failed to vacate" the Commission's order is erroneous, because the
district court lacked such authority.
12. At oral argument, the Cities acknowledged that the application of these ordinances is not
limited to Allen's rights-of-way. Thus, Allen's ordinances do not merely condition the use of, or
control access to, its streets and rights-of-way.
13. "Facilities" means all of the plant and equipment of a public utility, and includes tangible
and intangible property, without limitation, owned, operated, leased, licensed, used, controlled, or
supplied for, by, or in connection with the business of the public utility. Tex. Util. Code Ann.
§ 11.003(10) (West Supp. 2004-05).
14. Soward arrived at this figure by estimating the costs for one mile of total overhead circuit
and the cost for one mile of functionally equivalent underground circuit. He then calculated a cost
differential factor by dividing the underground circuit cost by the overhead circuit cost. He applied
this factor to the overhead components of Allen's project and divided the total amount by the original
cost.
15. Soward arrived at this figure by calculating the cost of one mile of standard overhead
feeder on wooden poles. He then calculated the difference between a concrete or steel pole and a
wooden pole. After that, he multiplied the cost difference per pole by the number of poles in the
mile of line, and added that product to the base cost, yielding the cost for a line with concrete or steel
poles. He identified the cost differential factor as the cost of an overhead line with concrete or steel
poles, divided by the cost of the standard overhead line with wooden poles.
16. "Aesthetically less obtrusive" and "increased property values" were two of three "pros"
that John Baumgartner, Allen's city engineer, offered to support the use of underground utility
facilities. His presentation to the Allen city council about the "pros and cons" of underground utility
facilities also listed "protection from wind and ice-related weather" as a third benefit. The five
"cons" that Baumgartner identified were: "significantly more expensive to install," "more difficult
to repair," "insufficient room in the rights-of-way to locate all providers easily," "subject to damage
from other construction," and "difficult to locate horizontally and vertically."
17. Rudy Garza testified that geographic ratemaking is disfavored because it can increase rates
and stifle competition. He explained that use of systemwide rates benefits competition by
standardizing the rates for a service area, thereby minimizing the barriers to market entry for new
retail electric providers. Matthew A. Troxle, a senior retail market analyst in the Commission's
electric division, agreed that increased rates harm competition by reducing or eliminating the
potential electric competitors' margin to undercut the regulated price-to-beat rate. See Tex. Util.
Code Ann. § 39.202(a) (West Supp. 2004-05).